# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1500

_____

Kathleen Mole,                  *
                                       *

      Plaintiff - Appellant,        *

                                         *    Appeal from the United States
      v.                          *    District Court for the
                                         *    Eastern District of Missouri.

Buckhorn Rubber Products, Inc.,     *

                                         *

      Defendant - Appellee.       *

_____

Submitted: September 22, 1998
Filed: February 1, 1999

_____

Before BEAM, LAY, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

Kathleen Mole commenced this action alleging that Buckhorn Rubber Products, Inc. ("Buckhorn"), violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"), and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.055.1(1) ("MHRA"), when it fired her for persistent poor job performance despite knowledge

of her disabilities, multiple sclerosis ("MS") and severe depression.  The district court[1] granted summary judgment dismissing these claims, concluding Mole failed to present sufficient evidence to establish two elements of a prima facie case of disability discrimination or a triable issue of pretext.  Mole appeals.  We review the grant of summary judgment de novo, viewing the record in the light most favorable to Mole, the non-moving party.  See Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1315 (8th Cir. 1996).  We affirm.

Buckhorn hired Mole in 1982 as a clerk/typist in Hannibal, Missouri.  In 1987, she was promoted to customer service coordinator and transferred with the Sales Customer Service Department to Ohio, where she later received another promotion.  In 1990, Buckhorn relocated the Sales Customer Service Department back to the Hannibal facility, promoting Mole to senior customer service coordinator.  Mole received excellent job performance reviews throughout this period.

**Mole Develops Job Performance Problems.**  David Johnston became Mole's supervisor in April 1991.  In her December 1991 written Performance Appraisal, Johnston rated Mole as "needing improvement" in four of ten performance categories, criticizing her for a negative attitude towards customers and for failing to provide leadership and direction to fellow employees.  Mole rated her own performance as good, considering the division was short-staffed, but acknowledged that she needed to "handle stress better."  Johnston met with Mole numerous times in 1992, sometimes in the company of Ronald Meyer, Buckhorn's industrial relations manager, to comment on her unsatisfactory performance.  In late 1992, Johnston sent Mole a memo in which he noted "key mistakes in the past few months," criticized her failure to follow instructions, and warned her that a failure to improve could result in "appropriate

---

[1]The HONORABLE GEORGE F. GUNN, JR., United States District Judge for the Eastern District of Missouri, who to our great regret has died since completing his work on this case.

disciplinary action." In early 1993, Buckhorn transferred some important customer accounts from Mole to the other customer service coordinator, Angela Dillman. Dillman testified that she discovered errors and heard customer complaints after taking over some of Mole's accounts. Buckhorn's receptionist testified that she received complaints from customers who asked to be transferred to someone other than Mole.

In June 1993, Johnston authored another written performance review, rating Mole as "needing improvement" in six categories, "marginal" in two, and "effective" in two. Johnston noted that Mole resisted change in the department, had a negative attitude with customers, and made errors. After stating that Mole was being demoted to customer service coordinator, the review concluded:

> Kathy has been ill during the past eighteen months, and the extent to which her illness has contributed to her poor performance is not easily gauged. The timing of this review is such that Kathy has just returned to work from her illness. If her performance should significantly improve in the months following her return from this illness, I will gladly review her again in six to nine months.

Johnston prepared another written performance review in December 1993, rating Mole as "needing improvement" in six and "marginal" in four categories, and noting that she continued to have problems with lack of motivation, disorganized work space, and customer relations. Meyer added a handwritten comment at the end of this document: "Within the next 6 months we will determine whether Kathy will remain in her Customer Service position. Her performance must substantially improve immediately." Mole's written self-assessment stated that she had done the job to the best of her ability and commented, "I do not feel my having M/S should be held against me."

On February 10, 1994, Johnston met with Mole and delivered a memorandum detailing five instances of significant customer order errors and concluding: "In your last review you were told that you would have to improve in all aspects of the job, and

to date I have not noted any such improvement. Continued lack of improvement will lead to termination."

**Mole Develops MS and Depression.** In April 1993, Mole began experiencing difficulty with her balance, memory, vision, and a weakened right leg. In early May, Meyer learned that Mole was suffering from headaches and dizziness. He referred her to a medical specialist and, when an initial appointment suggested a need for further testing, placed her on paid sick leave for that purpose. After Dr. Irving Asher diagnosed Mole as having MS, Buckhorn placed her on paid sick leave for over two weeks, and she was hospitalized and treated with steroids and anti-depressant medication. In June 1993, Dr. Asher examined Mole again and suggested she rest at home for two weeks to alleviate her heat sensitivity and fatigue. Buckhorn granted this request. Mole's depression fluctuated between August and October, while her physical condition remained stable until November, when she was again hospitalized.

On December 15, Johnston met with Mole to discuss her health and "glean an understanding of her condition." Mole said she was feeling fine and confirmed that her doctor had approved her return to work. She was nervous and cried through much of the meeting, particularly when her handling of customers was criticized. Mole returned to work but suffered a seizure on December 17 and was again hospitalized. Her physical condition had improved by early January 1994, and in March she had a "normal" exam, following which Dr. Asher called Meyer at Buckhorn and found him "very supportive." Meyer stated that Mole had "improved over the course of her treatment" and suggested another leave of absence, if needed. Dr. Asher did not suggest and Mole did not request a leave of absence.

**Mole Is Terminated.** On June 10, 1994, Johnston authored a Performance Update. He stated that Mole "is putting forth her very best effort to improve her performance [but] this improvement is inadequate." After outlining several costly customer order errors, Johnston recommended that Mole be terminated. On June 30,

Johnston and Meyer met with Mole and delivered a two-week notice of termination. The notice advised, "The date of your termination will be July 14, 1994, and the last day of active employment will be today, June 30, 1994." That same day, Buckhorn's general manager sent Mole a letter explaining "the different insurance benefits and welfare plans you could be eligible for if you would need to go on to total disability." Mole met with Buckhorn officials on July 14. She asked to be accommodated with rest breaks, days off, and the addition of a third customer service coordinator. She presented a July 11 memorandum from Dr. Asher stating:

> Ms. Mole has multiple sclerosis. I believe her inability to function adequately at work has been due to her illness. Multiple sclerosis will be a lifelong illness for her and will likely fluctuate considerably.

Buckhorn declined to reinstate her.

Mole commenced this action in October 1995, alleging that Buckhorn violated the ADA and the MHRA by refusing to accommodate her disability and terminating her. The ADA prohibits covered employers, such as Buckhorn, from "discriminat[ing] against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112 (a). A qualified individual with a disability is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). Disability discrimination is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie case of disability discrimination under the ADA, Mole must show that at the time in question she was disabled, was qualified to perform the essential functions of her job with or without reasonable accommodation, and was terminated under circumstances that raise an inference of unlawful disability discrimination. See Price v. S-B Power Tool, 75 F.3d 362, 365 (8th Cir.), cert. denied,

117 S. Ct. 274 (1996).  The same analysis applies to claims under the MHRA.  See Mathews v. Trilolgy Communications, Inc., 143 F.3d 1160, 1164 n.5 (8th Cir. 1998).

The district court concluded that Mole failed to establish the second and third prongs of her prima facie case.[2]  She was not qualified to perform the essential functions of her job, the court explained, because "her problems in the position since 1991 were well-documented and affected the essential functions of the job," she "does not dispute that she made the errors or the significance of those errors," she "did not provide in a timely manner any suggested accommodations that would have cured the problems," and some of the accommodations she requested after termination were unreasonable.  Mole's discharge did not give rise to an inference of disability discrimination, the court concluded, because her negative performance reviews began before Buckhorn knew she had MS and her assertion that Buckhorn fired her to reduce the self-insured costs of future MS treatment was sheer speculation.  Alternatively, the court concluded that even if Mole established a prima facie case of disability discrimination, Buckhorn offered a legitimate reason for termination, her poor job performance, and Mole presented insufficient evidence of pretext.  After careful review, we agree with this assessment of the summary judgment record.

**Qualified Individual with a Disability.**  To be a "qualified individual" entitled to ADA protection, "a plaintiff must show that [her] work performance met the employer's legitimate job expectations," with or without reasonable accommodation.  Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998) (quotation omitted).

---

[2]On appeal, the parties debate whether Mole has a "disability" as defined in the ADA and therefore satisfied the first prong of her prima facie case.  The district court concluded this was a genuine issue of material fact, and we need not consider it.  For the resolution of this issue in other ADA cases involving plaintiffs suffering from MS, see Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 786 (8th Cir. 1998); Leffel v. Valley Fin. Servs., 113 F.3d 787, 792 (7th Cir.), cert. denied, 118 S. Ct. 416 (1997); and Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 884-85 (6th Cir. 1996).

It is undisputed that Mole had the necessary experience and training for the position of customer service representative, and performed more than adequately in that position for many years. However, Buckhorn documented serious performance deficiencies beginning in 1991 and Mole's failure to meet repeated demands for improved performance from 1992 until she was terminated in June 1994. An ADA plaintiff may not rely upon past performance to establish that she is a qualified individual *without accommodation* when the employer has produced undisputed evidence of diminished or deteriorated abilities.

Mole argues Buckhorn failed to define the essential functions of her position. See Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995). On the facts of this case, the contention is without merit. It is undisputed that the key responsibilities of a customer service coordinator were to take and enter orders accurately, and to respond to customer inquiries and complaints. Buckhorn documented Mole's order inaccuracies and poor customer relations over an extended period of time. While admitting these deficiencies, Mole argues they were minor, citing testimony by co-workers and one customer expressing positive opinions about her job performance. However, these persons had much more limited contact with Mole and her work than Johnston, Meyer, and Dillman. Mole bears the ultimate burden of proof on this issue, see Benson, 62 F.3d at 1113, and "consideration shall be given to the employer's judgment as to what functions of the job are essential." 42 U.S.C. § 12111(8). We agree with the district court that Mole failed to establish that she could perform her essential job functions without accommodation.

That leaves the question whether Mole presented sufficient evidence that she would have been a qualified individual if Buckhorn had reasonably accommodated her disabilities. Mole concedes that Buckhorn helped her seek medical treatment, granted her leaves of absences for diagnosis and treatment of MS and depression, allowed her time off and breaks when she returned to work, and distributed some of her work to other employees. Dr. Asher testified these were reasonable accommodations for an

employee with MS. But Mole argues Buckhorn knew or should have known how to afford her further accommodations.

As the district court recognized, the problem with this contention is that prior to receiving a notice of termination Mole never advised Buckhorn she needed additional accommodation, much less what accommodation specific to her position and workplace was needed. "In general, it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." Wallin v. Minnesota Dept. of Corrections, 153 F.3d 681, 689 (8th Cir. 1998) (quotation omitted); see Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago, 104 F.3d 1004, 1013 (7th Cir. 1997); Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 164-65 (5th Cir.), cert. denied, 117 S. Ct. 586 (1996). It is undisputed that between May 1993 and June 1994 Buckhorn was aware of and accommodated Mole's medical problems. There is no evidence Buckhorn failed to make a good faith reasonable effort to help Mole determine if other accommodations might be needed. See Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996). Mole argues Buckhorn should have learned more about accommodating MS by consulting informational pamphlets and discussing her condition with her doctors. But it is undisputed that Buckhorn had the pamphlets and discussed her condition with Dr. Asher. Only Mole could accurately identify the need for accommodations specific to her job and workplace. Mole cannot "expect the employer to read [her] mind and know [she] secretly wanted a particular accommodation and [then] sue the employer for not providing it." Ferry v. Roosevelt Bank, 883 F. Supp. 435, 441 (E.D. Mo. 1995) (quotation omitted).

Mole also argues that she requested specific accommodations on July 14, 1994, the effective date of her termination -- more breaks, fully staffing the department, air conditioning, written instructions, and more time to test new medication. Given the timing of the meeting, this was a request for reinstatement, not a timely request for on-the-job accommodations. Moreover, Mole could offer no assurance the requested

accommodations would remedy her many job performance deficiencies. Indeed, Mole accompanied these requests with a letter from Dr. Asher warning that she has a lifelong illness that "will likely fluctuate considerably." Finally, we agree with the district court that some of the requests were not reasonable. An employer is not required to hire additional employees or redistribute essential functions to other employees. See Moritz, 147 F.3d at 788 (8th Cir. 1998). Thus, the ADA does not require an employer "to change the essential nature of the job" in order to accommodate the personality and emotional deficiencies that may result from MS and depression. Boelman v. Manson State Bank, 522 N.W.2d 73, 81 (Iowa 1994).

On this record, we agree with the district court that Mole failed to present sufficient evidence she could meet Buckhorn's legitimate job expectations with or without reasonable accommodation of her alleged disabilities. Compare Wilking, 153 F.3d at 873. Accordingly, summary judgment was appropriate.

**Other Grounds for Summary Judgment.** To satisfy the third prong of her prima facie case, Mole must present sufficient evidence that the circumstances of her discharge give rise to an inference of unlawful disability discrimination. In addition, even if Mole presented sufficient proof of a prima facie case, to avoid summary judgment she must demonstrate that Buckhorn's legitimate reason for her discharge was pretextual, that "a discriminatory animus lies behind [its] neutral explanations." Wilking, 153 F.3d at 874. To show pretext, Mole must offer sufficient evidence for a reasonable trier of fact to infer intentional discrimination. See Christopher v. Adam's Mark Hotels, 137 F.3d 1069, 1073 (8th Cir.), cert. denied, 119 S. Ct. 62 (1998). We agree with the district court that Mole failed to meet these evidentiary burdens.

It is undisputed that Mole's poor job performance evaluations started long before Buckhorn knew she had MS and continued for more than a year after the initial diagnosis. Mole conceded she developed these performance problems and presented no evidence that her performance rose to an acceptable level by June 1994. Mole's

contention "that the infractions were not serious enough to warrant a discharge . . . merely questions the soundness of defendant's judgment, and does not demonstrate pretext for discrimination." Wilking, 153 F.3d at 874 (quotation omitted). Supporting affidavits from fellow employees who did not deal with Mole on a systematic basis are insufficient to counter Buckhorn's proof she was discharged because she did not meet its legitimate expectations. See Leffel, 113 F.3d at 791, 795-96. Finally, as the district court noted, Mole's contention that Buckhorn fired her to escape the high medical costs of treating her MS is totally unsupported. Thus, the record will not support an inference that her discharge was "based upon her perceived disability rather than upon actual shortcomings in her work." Leffel, 113 F.3d at 795.[3]

For the foregoing reasons, the judgment of the district court is AFFIRMED.

LAY, Circuit Judge, dissenting.

My basic disagreement with the trial court is in the application of the McDonnell Douglas burden-shifting analysis to the facts of this case. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). The majority opinion, without directly referencing McDonnell Douglas, applies the same burden-shifting analysis. Although our cases have given lip service to the McDonnell Douglas method of analysis in ADA cases, under the facts of this case it is unnecessary and inappropriate. The McDonnell Douglas analysis is designed to govern disparate treatment cases. The ultimate question served by such analysis is that of disparate treatment of the claimant

---

[3]Mole also argues that discharging her for performance deficiencies that were symptoms of her MS -- lack of motivation, data entry errors, and rudeness to customers -- is as unlawful as discharging her because of that disability. We disagree. Firing an employee because of the job performance consequences of a disability such as MS, rather than the disability itself, is not actionable under the ADA. See Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1196, 1198 (7th Cir. 1997); Mararri v. WCI Steel, Inc., 130 F.3d 1180, 1182-83 (6th Cir. 1997).

with others similarly situated. This case, however, does not involve a disparate treatment claim, but rather a reasonable accommodation claim that should be analyzed differently.[1]

The ADA is statutorily defined and driven. An employer may not "discriminate" against "a qualified individual with a disability because of the disability . . . ." 42 U.S.C. § 12112(a). Discrimination as defined has nothing to do with the claimant's disparate treatment. The ADA defines the term "discriminate" as follows:

> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]; or

> (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(A)-(B).

In most ADA cases, as here, a single question becomes the focus of the inquiry: whether the employer should have reasonably accommodated the employee's disability but did not.[2] In such cases, the McDonnell Douglas disparate treatment analysis is

---

[1]If a claimant under the ADA were making a claim of disparate treatment, such as an employer placing a greater burden on disabled workers than on other employees, then such a disparate treatment analysis would apply. Cf. Matthews v. Commonwealth Edison Co., 128 F.3d 1194 (7th Cir. 1997). However, no such claim is made here.

[2]The district court holds there is a question of fact as to whether the plaintiff is disabled. The majority avoids the issue. This totally ignores the record. There is no question that plaintiff suffers from multiple sclerosis and has manifested the symptoms

-11-

inappropriate.  See Bultemeyer v. Fort Wayne Community Schs., 100 F.3d 1281, 1283-84 (7th Cir. 1996); see also Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995) (stating that once the plaintiff makes a facial showing that reasonable accommodation is possible, the burden of production shifts to the employer to show that it is unable to accommodate the employee); Wood v. Omaha Sch. Dist., 985 F.2d 437, 439 (8th Cir. 1993) (stating that under the Rehabilitation Act a plaintiff need only make a facial showing that reasonable accommodation is possible and finding that the plaintiff met that burden by proposing certain accommodations); Arneson v. Heckler, 879 F.2d 393, 396 (8th Cir. 1989) (reversing dismissal of Rehabilitation Act claim because the plaintiff was "only required to provide evidence sufficient to make 'at least a facial showing that reasonable accommodation is possible'" before the burden shifts to the employer to prove it is unable to make the accommodation) (citation omitted).[3] Thus, it should be clear the McDonnell Douglas method of proof is irrelevant in this case.[4]  There is no question according to Mole's physicians that she suffers from MS

---

of that dreaded disease.  There is no refutation that her physicians have certified that she suffered depression, loss of motivation, lack of concentration, cognitive dysfunction, among other disabling symptoms which are inherent in that disease.

[3]Rehabilitation Act cases are relevant in analyzing the ADA "because the ADA specifically mandates that its provisions be interpreted in a manner that prevents imposition of inconsistent or conflicting standards for the same requirements under [the ADA] and the Rehabilitation Act of 1973."  Benson, 62 F.3d at 1112 n.2.

[4]The majority's dominant concern with the burden-shifting analysis probably resulted from the plaintiff's assertion that the Buckhorn termination was pretextual in kind.  Notwithstanding, a court should not be mislead by a party's irrelevant argument of incorrect legal principles involved in any case.  Here the issue of pretextuality was a nonissue simply because plaintiff did not rest her claim upon a basis of disparate treatment.  The mere fact that she argues it demonstrates only that her counsel confused the application of the burden-shifting analysis of McDonnell Douglas to a case of discrimination under the ADA.  In doing so, however, the court walks down the wrong path of analysis by finding no factual proof of pretextuality within the record.  Once again, it should be clear that pretextuality cannot be an issue in a case brought under the ADA where the statutory basis of discrimination relates to the defendant's failure to provide reasonable accommodation.  It should be obvious that whether the claim of

and that her symptoms affected her job performance.[5]   The relevant inquiry then becomes whether Buckhorn could or should have reasonably accommodated Mole's illness.

Under the present record, the reasonableness of the extent of Buckhorn's accommodation should be a question for the trier of fact.  See Wood, 985 F.2d at 439-440; see also Arneson v. Heckler, 879 F.2d 393 (8th Cir. 1989) (J. Beam).[6]  Material factual disputes remain concerning whether Buckhorn can reasonably accommodate Mole.  The record is replete with additional accommodations Mole contends Buckhorn could have made.  The National Multiple Sclerosis Society's information materials, which Buckhorn admittedly possessed, list several accommodations which could be

---

pretextuality is factually controverted is immaterial.  This question is totally subsumed in the determination of whether the employer provided reasonable accommodation to a qualified person's needs under the ADA.

[5]Mole claims that even without accommodation she was able to carry on her job at a satisfactory level.  Mole supports her claim with affidavits from co-workers and customers who dealt with her and found her work satisfactory.  Judge Loken rejects Mole's claim by observing:  "Supporting affidavits from fellow employees who did not deal with Mole on a systematic basis are insufficient to counter Buckhorn's proof she was discharged because she did not meet its legitimate expectations."  At the very least, however, this is an issue that a trier of fact should decide.

[6]In Arneson, Judge Beam noted a possible accommodation to a disabled employee was to furnish "a clerical assistant" or transfer.  Yet, Judge Loken found Mole's requests to have Buckhorn return to its previous three-person staffing of the customer service department to be unreasonable.

made to assist an employee with MS.[7]  Dr. Asher also listed several possible accommodations in his deposition testimony.[8]

However, the district court and now the majority emphasize that Mole cannot overcome the defendant's motion for summary judgment  because she failed to make requests for accommodations in a timely manner.  Such a defense does not logically or factually exist upon a fair review of the record.  The record shows that Mole made requests for accommodation during a meeting held on July 14, 1994, the effective date of her termination.  Mole requested rest breaks, some days off, time for her doctors to

---

[7]The Multiple Sclerosis Society's brochure offered the following suggested accommodations, noting that "[r]easonable accommodations can include changes in work schedules, job duties, workplace environment and employer attitudes:"

*Energy saving*:  rest period:  flexible working hours (to avoid rush hour traffic, etc.); parking space close to entrance; office location close to rest room; communication system allowing use of intercom instead of walking.

*Environmental control*:  air conditioning, good lighting.

*Accessibility*:  ramps, wide doors, adaptable work station arrangements, grab bars in bathrooms.

*Job modifications*:  trading nonessential duties for other tasks which do not conflict with functional limitations.

*Technological adaptations and devices*:  may have some cost attached but also may be provided by outside sources.

[8]Dr. Asher testified that necessary accommodations would change from time to time due to the disease, but would include the following:  (1) permitting leaves of absence for medical treatment and follow-up; (2) allowing rest breaks during the day to regain energy; (3) limiting hours of work; (4) permitting the use of medication; (5) providing an air-conditioned workplace; and (6) giving written instructions to overcome memory deficits caused by the disease.

determine the proper prescriptions and dosages to manage her illness,[9] and fully staffing the customer service department. She also submitted a note to Buckhorn from Dr. Asher stating that her MS was causing her work problems. Unfortunately, this court feels her requests came too late because she made them after she was terminated. The record reveals, however, that Mole made her requests and submitted her physician's letter the very same day that her termination was to take effect.[10] Considering the human concerns involved here, it is difficult to accept the majority opinion's myopic view of the record. "A few hours' tardiness should not be the reason for cutting off the interactive process and cutting off a person's rights under the ADA." Bultemeyer, 100 F.3d at 1286. Mole's delay was not lengthy or inexcusable. After Mole requested accommodation on July 14, 1994, and presented her physician's letter, Buckhorn could have reconsidered its decision to terminate Mole and could have then included Mole and Dr. Asher in discussions regarding reasonable accommodations. See id. Instead, Buckhorn's officials refused to provide Mole any further accommodation.

Even assuming we cannot credit Mole's testimony that she requested accommodation (albeit on summary judgment), or if we accept the majority's finding that Mole's requests came too late, the record shows that Buckhorn knew accommodation alternatives were available prior to its termination of Mole. Buckhorn was in direct contact with Mole's physicians prior to July 14, 1994. Buckhorn knew Mole suffered from multiple sclerosis, and Buckhorn possessed informational

---

[9]Approximately a month before Mole was terminated, her doctors prescribed a new medication, Betaseron, to treat her illness. Mole's doctors testified that it would take some time to determine the therapeutic effect the Betaseron would have on Mole's symptoms. The record indicates that Mole told Buckhorn representatives during the July 14, 1994, meeting that it would take time for her doctors to establish the appropriate prescriptions and dosages to treat her illness.

[10]Although Mole's last day of active employment was on June 30, 1994, the date on which Buckhorn gave Mole a two-week notice of termination, the notice expressly stated that "the date of [Mole's] termination will be July 14, 1994." Arguably, Mole was still employed by Buckhorn until the end of the day on July 14, 1994.

brochures that specified possible accommodations such as, "changes in work schedules, job duties, workplace environment and employer attitude(s)." To suggest that Buckhorn was not alerted to the need for reasonable accommodations ignores the historical facts. Buckhorn had conversations with Mole before her termination regarding accommodations, and Buckhorn had in fact provided some accommodations to her. However, as Mole argues, Buckhorn "runs away from its own lawful duties under 29 C.F.R. § 1630.2(o)(3)[11] to initiate an 'interactive process' and affirmatively find out what will work."

This court on prior occasions has stated that summary judgment should be used only in rare instances in employment discrimination cases. See Davis v. Fleming Cos., Inc., 55 F.3d 1369, 1371 (8th Cir. 1995); Oldham v. West, 47 F.3d 985, 988 (8th Cir. 1995); Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994). This admonition certainly applies to cases arising under the ADA. Today we simply give lip service to our earlier admonition. A fair reading of the record and the correct application of the proper standards require a different result.

---

[11]29 C.F. R. § 1630.2(o)(3) reads:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.