52 F.Supp.2d 1096 (1999)
Louis KAMPOURIS, Plaintiff,
v.
SAINT LOUIS SYMPHONY SOCIETY, Defendant.
No. 4:98CV512-DJS.
United States District Court, E.D. Missouri, Eastern Division.
June 10, 1999.
*1097 *1098 Stanley E. Goldstein, Partner, Eli Karsh, Liberman and Goldstein, Clayton, MO, for Louis Kampouris, plaintiff.
Richard E. Jaudes, Hope K. Abramov, Thompson Coburn, St. Louis, MO, Aaron C. Baker, Descher and Schultz, St. Louis, MO, for St. Louis Symphony Society, The, defendant.

ORDER
STOHR, District Judge.
The instant action arises out of plaintiff's employment with defendant as a violinist. Count I of the complaint asserts that defendant has discriminated against plaintiff on the basis of a perceived disability, in violation of the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Missouri Human Rights Act ("MHRA"), § 213.010 R.S.Mo. et seq. Count II alleges that defendant discriminated against plaintiff on the basis of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the MHRA. Lastly, in Count III, plaintiff asserts that defendant is liable to him for intentional infliction of emotional distress. The matter is now before the Court on cross-motions for summary judgment. Plaintiff seeks partial summary judgment as to liability on Count I, his perceived disability claim. Defendant seeks summary judgment on all counts of the complaint.
Plaintiff alleges, without dispute, that he began employment with defendant in 1949, that in December 1994 his physician ordered him to stop playing the violin because of a nerve problem, and that as a result he was on long-term disability leave from December 1994 to July 1997, during which time he received disability benefits from defendant's disability insurance provider. Complaint, ¶ 8. In April 1997, plaintiff returned to work as a violinist for defendant. In June 1997, plaintiff's doctor released him to return to work full-time, and the disability benefits ceased. Plaintiff claims that he worked a full-time schedule from mid-May to August 2, and that in September 1997 defendant "informed Plaintiff that he could not play violin for Defendant because he was not ready to return." Id. at ¶ 13. Plaintiff asserts that defendant's refusal to permit him to return to work is based on defendant's perception that plaintiff has a disability[1] and on plaintiff's age (now 68), and *1099 that defendant's conduct in that regard and others has caused plaintiff severe emotional distress.

Factual Record
The Court has carefully examined the voluminous factual record and finds that, unless otherwise noted, the following facts are not genuinely in dispute.
Plaintiff first sought treatment for his neurological problem in 1989 from a Dr. Black, who performed electrical studies showing abnormalities of the ulnar nerves at the elbows on both sides. Approximately five years later, on December 8, 1994, plaintiff saw Dr. Stuart Weiss, a neurologist, complaining of weakness in his hands affecting his playing. Plaintiff thereafter met with Jeffrey Neville, the Symphony's Director of Orchestra Personnel, to inform him that Dr. Weiss indicated that plaintiff should stop playing. Plaintiff stopped playing with the Symphony at that time. Plaintiff provided Neville with a copy of Dr. Weiss' note, also dated December 8, 1994, stating that plaintiff "will be unable to perform satisfactorily because of ... muscle weakness and further aggravation of his neurologic problem by his professional activity." Neville provided a copy of the note to Judy Elders, the Symphony's Personnel Director.
For the first twenty-six weeks of this period, to early June of 1995, plaintiff received full pay. Thereafter, plaintiff's status became one of long-term disability, under which he received benefits equal to 60% of his salary. Under the applicable insurance policy, eligibility for the first 24 months of disability benefits is subject to a "disabled from one's own occupation" standard. Thereafter, continuation of disability benefits is subject to the higher standard of "disabled from any occupation."
Plaintiff continued under the treatment of Dr. Weiss but consulted a number of other physicians as well. Plaintiff was found by Dr. Jerome Gilden in May 1995 to have marked changes in his hands, including atrophy of the muscles in his hands and loss of feeling; Dr. Gilden concurred with another physician's suggestion that plaintiff undergo surgery to address compression of the ulnar nerves behind both elbows. Plaintiff consulted Dr. Richard Gelberman on June 5, 1995 with similar complaints, stating that he had persistent problems fingering his violin and decreased dexterity, but asserting that by modifying his technique he continued to be able to play.
Dr. Gelberman performed decompression surgery on plaintiff's right elbow on June 27, 1995. Surgery on his left elbow was performed on September 5, 1995. Bilateral ulnar motor nerve conduction studies in December 1994, pre-surgery, and in 1996, post-surgery, yielded similar results, suggesting to Dr. Weiss that plaintiff's condition was not improved over that time. In December 1996, Dr. Weiss concluded that plaintiff was likely to have a persistent and permanent deficit relating to his ulnar nerves. When plaintiff inquired about playing his violin, Dr. Weiss advised him to practice for six weeks and "audition" for a friend from the Symphony who could help judge the quality of his playing, but that if his medical condition worsened as a result of playing he would need to stop.
Dr. Gelberman is of the view that electrical studies after surgeries are difficult to interpret and not necessarily accurately reflective of improvement in the patient's condition. Post-operative visits to Dr. Gelberman revealed progress in the form of increased sensation, but, "as anticipated, .. continued ... weakness in his hands and atrophy in the small muscles required for fine dexterity, manipulation, bowing and fingering." Gelberman Depo., p. 16, 1. 6-9. By December 4, 1995, plaintiff was playing the violin, and reported to Dr. Gelberman continued problems fingering with his left little finger and with the pinch strength of his right hand in relation to bowing. By November 21, 1996, Dr. Gelberman found great post-operative improvement in plaintiff's left hand, but some continued weakness in the right. Plaintiff was advised that continued playing would *1100 not cause him any harm because the ulnar nerves were now in a protected position. As of plaintiff's visit to Dr. Gelberman in February 1997, Dr. Gelberman saw no medical reason preventing plaintiff from playing the violin.
Plaintiff consulted Dr. Alice Brandfonbrener in March 1997 reporting weakness in his hands, even after surgery. Plaintiff brought his violin to the visit, and at that time had difficulty holding the bow in position. Based upon her examination, Dr. Brandfonbrener concluded that in light of the long-term nature of the problem, the degree of atrophy plaintiff had sustained, and his age, it was unlikely that plaintiff would regain sufficient muscle strength in his hands to permit playing the number and length of services that a major symphony would require of him.[2] Dr. Brandfonbrener nonetheless encouraged plaintiff to try to return, if he wanted to.
Jeffrey Neville spoke with Dr. Brandfonbrener. His March 14, 1997 memorandum concerning that conversation indicates that Dr. Brandfonbrener "said that she did not feel that Louis was going to get the strength in his hands back that is needed to play the violin," and that plaintiff "would not be able to sustain 2 services in one day." Neville's memorandum, apparently directed to Judy Elders, indicates that Dr. Brandfonbrener and plaintiff had discussed the possibility of plaintiff's retirement, and states Neville's intention to discuss with plaintiff "the opportunity, after he retired, to play KK, pops, or similar services." Addressing Elders, Neville indicates "we should meet with Lou to make sure that he understands his insurance and options."
Mark Sampson, a claims analyst from the insurance company, completed a review of plaintiff's status dated March 7, 1997, at which time he found that the medical evidence reasonably supported a determination that plaintiff continue to be eligible for benefits as disabled from any occupation. The medical evidence he reviewed included Dr. Weiss' chart notes through December 1996, along with the Dr. Weiss' "Attending Physician Statements" submitted to Standard Insurance Company. By letter dated March 12, 1997, Sampson notified plaintiff that after June 5, 1997 he would remain eligible for benefits under the "any occupation" standard until December 5, 1997, the end of plaintiff's "maximum benefit period." As of June 5th, the insurance company classified plaintiff as disabled from any occupation, for the purpose of extending his long-term disability benefits. Jeffrey Neville was informed of that classification.
On March 17, plaintiff met with Jeffrey Neville and Judy Elders. Neville advised plaintiff that as of June 5, 1997, if he was unable to return to active membership, the Symphony would audition for a replacement for his position. Plaintiff was further advised that if he was unable to return, the insurance company having classified him as disabled from any occupation, he would continue to receive disability benefits until December 5, 1997, at which time, based on his age, disability benefits would cease and he would be placed on retirement and begin to receive his pension.
On April 30, 1997, plaintiff began playing with the Symphony again, and played a variety of services through May and June, and into July 1997. During his May 12, 1997 visit with Dr. Gelberman, plaintiff reported that he had returned to the Symphony but was finding it difficult; at that time, Dr. Gelberman thought plaintiff's use of his hands was improving and that another several months would yield additional improvement. A copy of Dr. Gelberman's notes of this visit were sent to Jeffrey Neville.
The Symphony's schedule has three parts: the Subscription Season, the Opera/Chamber Season and the Queeny Pops. The Subscription Season runs from September through mid-May and usually requires eight or nine services per week. The Opera/Chamber season runs from *1101 mid-May to the end of June with between four and eight services per week. The Queeny Pops season, the last three weeks in July, ordinarily requires seven to eight services per week, but the music is less complex and fewer rehearsals are necessary. The Symphony requires a full-time musician to be physically capable of at least seven to eight services per week. Plaintiff's workload when he returned to the Symphony in May through June 1997 was therefore relatively light, with the most demanding week (May 20, 1997) consisting of eight services and all others consisting of between five and seven services.
Jan Gippo is a musician with the Symphony and a co-chair of the Orchestra Committee, a group of six musicians who function as the stewards of the musicians' union and as advocates for the musicians. Marc Gordon is a musician with the Symphony and the former co-chair of the Orchestra Committee. Both Gippo and Gordon acknowledge the existence of a policy under which a musician on disability leave must demonstrate fitness to return to full-time status within 24 months, or his position is filled and he is no longer considered an active playing member of the Symphony. Under such a policy, the musician would not be required to re-audition for his seat, but mere physical ability to play is not sufficient; there must also be ability to play up to the required artistic level. In a sworn statement dated January 14, 1999, Gordon attests that this policy was agreed to by the Symphony and the Orchestra Committee, "with the understanding of Local 2-197," subsequent to the Kaid Friedel arbitration in the early 1990's.
Jeffrey Neville testified in his deposition to understanding that the 24-month rule represented a decision made by the union, the Orchestra Committee and Symphony management after an arbitration, and that the rule went into effect in early 1991. Neville attests that the two-year policy has been applied consistently for years, as for example with musicians Carol Denos, Kenneth Pickney and Cara Mia Antonello. After Antonello's two-year period of "own occupation" disability, she was classified by the insurance company as disabled from "any occupation" and informed the Symphony she was unable to return. Her seat was filled by audition. At the end of Denos' two years of "own occupation" disability, she too was classified as disabled from "any occupation" and her seat in the violin section was permanently filled.
Judy Elders is the Symphony's Personnel Director, a member of the Orchestra Committee, and a regular contracted musician with the orchestra. She attests to the existence of the two-year rule, and that it came into being in response to an arbitration decision dating to the early 1990's. A February 27, 1992 memo to file by Elders reads:
Things determined by the Kaid Friedel Arbitration decision:
1. a disabled musician is treated like an active employee and remains covered by the Society's group medical and dental plans as long as he/she receives long term disability benefits.
2. a disabled musician's position can be filled permanently when the disabled musician is determined to be totally disabled from any occupation, and never to return to the Orchestra. During Kaid Friedel's grievance meeting, and subsequent arbitration, the union attorney, Charles Werner, stated that disabled musicians can be replace [sic] after they are determined to be totally disabled from any occupation (after 2 years of disability).
(Emphasis in original.)
June 5, 1997 constituted the two-year anniversary of plaintiff's period of long-term disability. As of that date, the Symphony had not received any medical records indicating that plaintiff was fit to return to work. On June 6, 1997, Symphony management met with plaintiff and informed him that he would not be returned as an active member based on his failure to meet the June 5 deadline. Plaintiff acknowledges that Jeffrey Neville advised *1102 him prior to June 5 that plaintiff had to return to work full-time by June 5 or he would not be permitted to return as an active member of the orchestra. Neville later extended the deadline by two weeks to June 19.
In mid-June, the Symphony was provided with a full unrestricted release from Dr. Gelberman, issued by him at plaintiff's request, and not based upon a new examination of plaintiff. After receiving it, Jeffrey Neville told plaintiff he thought the release was "suspect" because it was inconsistent with Dr. Gelberman's opinions of the month before. As of July 3, 1997, the insurance company took plaintiff off long-term disability status in light of Dr. Gelberman's unconditional release and because plaintiff had been working and being paid by the Symphony. Neville and Bruce Coppock, the Symphony's Executive Director, made the decision not to allow plaintiff to return to his full-time position and not to pay plaintiff's regular salary thereafter, based on their belief that Dr. Gelberman's release was not credible. The medical opinions on which Neville based his decisions included Dr. Weiss' and Dr. Brandfonbrener's opinions that plaintiff probably would not be able to return to full-time employment with the Symphony. Neville also knew that in May, Dr. Gelberman said plaintiff was finding his return to the Symphony difficult and that it would take several more months to return to full capacity, and deemed suspect the full unrestricted release provided by Dr. Gelberman the next month with no explanation.
In a sworn statement dated January 11, 1999, Gippo attests that "the Symphony and the Orchestra Committee agreed that if [plaintiff] could demonstrate through an opinion by a qualified specialist, who understood the demands of playing full time in a major symphony orchestra, that he was fit to return to work as a full-time musician with the Symphony, the Symphony would consider making an exception to its twenty-four month policy."
The physician to whom plaintiff was referred to provide an independent opinion to the Symphony was Dr. Richard T. Katz. Plaintiff refused to sign a release pursuant to which Dr. Katz could obtain and review plaintiff's prior medical records. Dr. Katz issued a report dated August 13, 1997 expressing findings including his impression that plaintiff was extremely concerned that Dr. Katz be persuaded that plaintiff had no limitations. Dr. Katz found that "[s]evere atrophy of [the] ulnar musculature in both hands" was "obvious." Dr. Katz opined that plaintiff continued to show "persistent physical impairment due to ulnar neuropathy bilaterally at the elbow." He further found "persistent weakness in the first dorsal interosseous on the right, obviously an important muscle for sustaining the action of the bow" and weakness in several "obviously important muscles for the left hand."
In December 1997, after advising plaintiff of Dr. Katz' opinion, the Symphony suggested several alternative methods by which plaintiff might prove his fitness to return.[3] These included performing a blind audition, or playing in a different position in the orchestra from which the principal strings and Musical Director could judge his performance. Plaintiff refused each of these. In January 1998, Jeffrey Neville wrote the president of the musicians Local 2-197, articulating the Symphony's principal concern as whether plaintiff was physically capable of performing to its artistic standards, and stating that the medical evidence known to the Symphony at that time suggested not. Neville's letter indicates that:
the Symphony would be willing to accept any reasonable method, proposed by *1103 Louis, the Union, or the Symphony, which would show that Louis' belief [in his artistic ability) is correct, and that the limitations found by Dr. Katz do not prevent him from performing up to the artistic standards of the Saint Louis Symphony.
Def.Exh. BB-5. No such method was agreed upon, and this action was filed on March 25, 1998.

Count I  Perceived Disability Discrimination Claim
The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The MHRA similarly prohibits handicap discrimination, and "handicap" is defined as the substantial equivalent of "disability" under the federal law. § 213.055.1(1)(a) and § 213.010(10) R.S.Mo. The familiar burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), applies in disability discrimination cases. Price v. S-B Power Tool, 75 F.3d 362, 364-65 (8th Cir.1996). Federal law may be used to analyze discrimination claims under the MHRA. Tart v. Hill Behan Lumber Company, 31 F.3d 668, 671 (8th Cir.1994).
In order to establish a prima facie case of discrimination based on disability, plaintiff must show that he is disabled or handicapped within the meaning of the statutory definitions, that he was able to perform the essential functions of his job, either with or without reasonable accommodation, and that he "suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises." Price, 75 F.3d at 365. "Disability" is defined in the ADA as:
(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.
42 U.S.C. § 12102(2). Plaintiff's perceived disability claim is based on subsection (C) of the definition.
Plaintiff's initial prima facie burden, then, is to demonstrate that he was regarded by the Symphony as having an impairment that substantially limited a major life activity, that he was able to perform the essential functions of his job as a violinist, and that there exist circumstances from which an inference can reasonably be made that the Symphony's refusal to return him to his seat in the fall of 1997 was unlawfully based on its perception that he was disabled. If plaintiff succeeds in such a showing, the Symphony must proffer a non-discriminatory basis for the adverse employment action. If it does so, the ultimate burden shifts back to plaintiff to both prove that reason to be pretextual and to show that the real motivation for the Symphony's challenged decision was unlawful discrimination.
The Court therefore first considers plaintiff's prima facie case. The Court finds as a matter of law that plaintiff has failed to establish the first element, namely that the Symphony perceived him to be disabled within the meaning of the ADA and MHRA. The Eighth Circuit has noted concerning the statutory definition of "disability" that "[t]he limiting adjectives `substantially' and `major' indicate that the perceived `impairment must be a significant one.'" Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir.1995) (internal citation omitted). In the absence of any suggestion otherwise, defendant and the Court presume that plaintiff's claim is based on the major life activity of working. Simply stated, the major life activity of working "does not mean working at a particular job of that person's choice." Id. at 386. "An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir.1994), quoted in *1104 Wooten, 58 F.3d at 386. Instead, "an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved." Forrisi v. Bowen, 794 F.2d 931, 934, 935 (4th Cir.1986).
Membership in a major symphony orchestra is, in the Court's view, sufficiently specialized employment to constitute a particular job or, at best, a narrow range of jobs. Neville's affidavit has identified a number of jobs still within plaintiff's field, and appropriate to his expertise and background, which, because less demanding, plaintiff would likely have been capable of performing even if his condition did not permit full performance of the Symphony's requirements. These include playing with a community orchestra, playing private performances, playing in orchestras for musical theater productions, and teaching violin. The Court finds that plaintiff fails to show that the Symphony considered him disabled from performing any of the class of jobs relevant to the required disability analysis, taking into account his expertise, background and job expectations. Webb v. Garelick Mfg. Co., 94 F.3d 484, 487 (8th Cir.1996). As the EEOC regulations and guidelines provide:
[A]n individual is not substantially limited in working just because ... he or she is unable to perform a specialized job or profession requiring extraordinary skill, prowess or talent. For example, an individual who cannot be a commercial airline pilot because of a minor vision impairment, but who can be a commercial airline co-pilot or a pilot for a courier service, would not be substantially limited in the major life activity of working. Nor would a professional baseball pitcher who develops a bad elbow and can no longer throw a baseball be considered substantially limited in the major life activity of working. In both of these examples, the individuals are not substantially limited in the ability to perform any other major life activity and, with regard to the major life activity of working, are only unable to perform either a particular specialized job or a narrow range of jobs.
29 C.F.R. Part 1630, App. § 1630.2(j).
Even viewing the record in the light most favorable to plaintiff, there exists no evidence suggesting that the Symphony questioned plaintiff's abilities beyond those necessary to perform to the particular standards of a musician in a major symphony orchestra.[4] In other words, when the Symphony sought to have plaintiff prove his fitness, it was to the limited extent of demonstrating plaintiff's ability to perform the "singular demands of a particular job." Where plaintiff had been classified for two years, without dispute, as disabled from performing his usual occupation, a requirement of proof that he was no longer so appears eminently reasonable, particularly in as performance-conscious an environment as a world-class symphony orchestra.
The same facts are relevant to the second element of the prima facie case, namely plaintiff's proof that he was capable of meeting the Symphony's legitimate job expectations. Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir.1998). Obviously, where plaintiff claims not to have been disabled, but only to have been *1105 perceived to be disabled, he must show his capability of performing the job in question without any accommodations by the employer. Furthermore, "[a]n ADA plaintiff may not rely upon past performance to establish that she is a qualified individual without accommodation when the employer has produced undisputed evidence of diminished or deteriorated abilities." Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1217 (8th Cir.1999) (emphasis in original). Plaintiff's acknowledged disability for more than two years places him in this category. Plaintiff would rely upon his recent performance during the summer of 1997 as establishing his ability to satisfy the requirements of his job. The Symphony's undisputed evidence concerning the differences in the demands of the summer schedule and the regular Subscription Season do not defeat plaintiff's showing, but create a dispute of material fact concerning whether plaintiff now demonstrates that he was able to perform the essential functions of the job.[5]
The final element of the prima facie case requires a showing that the circumstances of the adverse decision  the refusal to allow plaintiff to take his seat in fall 1997 raise an inference of unlawful disability discrimination. Largely for the same reasons as articulated above with respect to the first element, the Court finds that plaintiff does not meet his burden on this point. Because plaintiff does not show that the Symphony decisionmakers perceived him to be disabled in the statutory sense, and because there exists no evidence of any motivation other than skepticism that plaintiff's deteriorated physical condition permitted him to play to the Symphony's requirements of stamina and artistry, the circumstances do not suggest unlawful discrimination. The Symphony had been informed that several physicians who examined plaintiff were of the opinion that he would be unable to meet the requirements of his position due to the irreversible atrophy and continued weakness in his hands. Different circumstances produced similar analysis in Wooten: "The evidence bearing on [defendant's] perception of [plaintiff's] impairment indicates that its perception was not based upon speculation, stereotype or myth, but upon a doctor's written restriction of [his] physical abilities," which "only appeared to prevent him from performing a narrow range of ... jobs." Wooten, 58 F.3d at 386.
If the Court had found that the prima facie case was made, the burden would shift to defendant as described above. The Symphony's proffered nondiscriminatory reason for refusing to allow plaintiff to resume his seat has been earlier described: its belief that plaintiff had failed to demonstrate his fitness to return to work. Thus, "even if [plaintiff] presented sufficient proof of a prima facie case, to avoid summary judgment (he] must demonstrate that [defendant's] legitimate reason for [his] discharge was pretextual, that `a discriminatory animus lies behind [its] neutral explanations.'" Mole, 165 F.3d at 1218, quoting Wilking, 153 F.3d at 874. The plaintiff's ultimate burden of demonstrating pretext and actual discrimination has, in the Court's view, also not been sustained.
On the record now before the Court, no reasonable jury could determine that the Symphony's concern about plaintiff's fitness to play was a pretext for unlawful discrimination motivated by a belief that plaintiff was disabled from the major life activity of working. The affidavits of fellow musicians attesting that during plaintiff's service in the summer of 1997 they did not observe any physical limitations hampering his performance do not establish that the Symphony's skepticism was pretextual or that the Symphony was actually motivated by discriminatory animus. Furthermore, "affidavits from fellow employees *1106 who did not deal with [plaintiff] on a systematic basis are insufficient to counter [defendant's] proof" as to its concerns about plaintiff's ability to perform. Mole, 165 F.3d at 1218.
Plaintiff challenges defendant's reliance on the 24-month rule, arguing that its existence as an actual policy is suspect and that if it exists, it does so in violation of the governing collective bargaining agreement. As to the first point, plaintiff fails to proffer evidence creating a genuine dispute of material fact. Despite plaintiff's bold assertions suggesting otherwise, the Symphony's evidence of the policy includes materials predating its application to plaintiff, testimony of a number of musicians and management concerning their awareness of the policy, and evidence of its application to other musicians. Whether the policy is violative of the collective bargaining agreement is not shown to be relevant to the discrimination analysis, and no labor law claim is before the Court. The existence of a separate employment contract between plaintiff and defendant and any alleged breach of it are likewise not relevant to the discrimination analysis; plaintiff's briefs indicate those issues are being arbitrated.
For all the foregoing reasons, the Court will deny plaintiff's motion for partial summary judgment on Count I and will grant defendant summary judgment on Count I. In so doing, the Court does not diminish the purpose of the ADA, to address "unfair and unnecessary discrimination and prejudice" against persons with disabilities. 42 U.S.C. § 12101(a)(9).
Nevertheless, a court of law must venture beyond such sweeping abstractions and ask various questions which, without a doubt, will fail to produce the sort of emotional thunder often engendered by broadly worded statements of remedial intent, but which are indispensable to a meaningful application of a statute. One query requires us to ponder who, in fact, are the intended beneficiaries of a law[.]
Dush v. Appleton Electric Company, 124 F.3d 957, 961 (8th Cir.1997). By failing to prove all the elements of the prima facie case, plaintiff fails to demonstrate that he is a person for whom the ADA provides a remedy. Whether or not the adverse employment decision he challenges was otherwise fair or justified or wise  a question which the Court has no authority to, and does not, address  it does not violate the ADA.

Count II  Age Discrimination Claim
Plaintiff's claim that the adverse employment decision was unlawfully motivated by his age is also subject to a burden-shifting analysis. Protected age being a much simpler classification than statutorily-defined disability, plaintiff's prima facie case is here more readily made. For purposes of this analysis, the Court assumes that burden is met. The Symphony's proffered non-discriminatory rationale is the same as previously discussed. As before, plaintiff is unable to demonstrate that this rationale is a pretext and further cannot demonstrate that the true motivation was plaintiff's age. Plaintiff cites no evidence supporting an inference that his age motivated the adverse decision of which he complains. For this reason, plaintiff's age discrimination claim is subject to judgment as a matter of law, and defendant will be granted summary judgment as to it.

Count III  Emotional Distress Claim
Plaintiff posits his claim of intentional infliction of emotional distress on the Symphony's refusal to permit him to resume his orchestral chair and the Symphony's alleged excoriation of plaintiff for failing to seek continued disability insurance payments from defendant's insurer. Under Missouri law, the cause of action requires extreme and outrageous conduct intentionally or recklessly causing severe emotional distress. Greco v. Robinson, 747 S.W.2d 730, 735 (Mo.App.1988). The Court concludes that no right to relief exists for the reason that, as a matter of law, the alleged conduct was not "extreme and outrageous." Under Missouri law, *1107 this is a threshold question for the Court. J.R. v. P.B.A., 773 S.W.2d 235, 236 (Mo. App.1989). The relatively routine type of employment action involved, and even the alleged "malicious rebukes" concerning disability benefits, are not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Pretsky v. Southwestern Bell Telephone Co., 396 S.W.2d 566, 569 (Mo.1965). The conduct alleged is not sufficiently outrageous to support liability under the high standard of Pretsky, which also requires that would-be plaintiffs be hardened to "occasional acts that are definitely inconsiderate and unkind." Id.[6]
Furthermore, specific to the employment context, Missouri law provides no cause of action for emotional distress resulting from the termination of an at-will employee, absent extraordinary circumstances and outrageous conduct not found here. Missouri courts have specifically rejected such claims, concluding that "[i]t would ... subvert the law of this state to allow a claim for termination by an at will employee to be brought under the guise of an action for emotional distress." Neighbors v. Kirksville College of Osteopathic Medicine, 694 S.W.2d 822, 824 (Mo.App. 1985), quoted with approval in Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. banc 1996). The Court has concluded that the alleged conduct on which plaintiff's claim is based is not sufficiently extraordinary or outrageous to escape application of this principle.
Lastly, to the extent that the emotional distress is alleged to have occurred during and in the course of plaintiff's employment, state law tort claims for infliction of emotional distress are preempted by Missouri Worker's Compensation law, which is exclusive and substitutional where it applies. Nichols v. American National Insurance Company, 945 F.Supp. 1242, 1247-48 (E.D.Mo.1996) [Hamilton, C.J.]; Miller v. Wackenhut Services, Inc., 808 F.Supp. 697, 701 (W.D.Mo.1992); Waldermeyer v. ITT Consumer Financial Corp., 767 F.Supp. 989, 993 (E.D.Mo.1991) [Nangle, J.]; State ex rel. McDonnell Douglas v. Ryan, 745 S.W.2d 152, 153 (Mo. banc 1988).

Conclusion
For all the foregoing reasons, the Court concludes that defendant is entitled to judgment as a matter of law on all three counts of plaintiff's complaint.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motion to strike defendant's motion for summary judgment for failure to comply with the Court's local rules [Doc. # 59] is denied.
IT IS FURTHER ORDERED that plaintiff's motion for summary judgment on Count I [Doc. # 52] is denied.
IT IS FURTHER ORDERED that defendant's motion for summary judgment [Doc. # 55] is granted.
IT IS FURTHER ORDERED that plaintiff's motion for leave to file exhibit [Doc. # 71] is denied as moot.
NOTES
[1] Plaintiff does not assert and apparently does not believe that he in fact suffers from a disability which impairs his ability to perform the job of a violinist for defendant.
[2] In Symphony parlance, a "service" is a rehearsal or performance.
[3] Neville attests that only Music Director Hans Vonk may judge plaintiff's musical quality. Vonk's limited presence during plaintiff's work in the spring and summer of 1997 and plaintiff's distance from Vonk in the orchestra pit did not permit Vonk to evaluate plaintiff's musical fitness to return. In order for Vonk to make such an evaluation, a special arrangement subject to plaintiff's cooperation would have been required.
[4] On points relevant to this issue, the Court finds that, in his memorandum in support of his motion for summary judgment, plaintiff has repeatedly mischaracterized deposition testimony of Jeffrey Neville in an attempt to support his position. See Pltf. Memo. [Doc. # 52], pp. 6, 8, 10, & 11; see also Def.Memo. in Opp. [Doc. # 53], pp. 5-6. Neville's testimony concerning the insurance company's "any occupation" classification of plaintiff as of June 5 does not constitute an admission that his own belief was that plaintiff was actually disabled from any occupation, that such thinking motivated his ultimate employment decisions concerning plaintiff, or that those decisions were made on June 5 based on the insurance company's classification. Plaintiff similarly mischaracterizes Bruce Coppock's October 10, 1997 letter to the musicians' union, Exh. 1 to Doc. # 56. See Pltf. Response [Doc. # 56], p. 8; Pltf. Reply [Doc. # 54], p. 2.
[5] Care must be taken to distinguish this element of the prima facie case from issues concerning whether, in fall/winter 1997, plaintiff adequately demonstrated to the Symphony his fitness to return to work and the Symphony's basis at that time for determining that he had not.
[6] The Symphony denies excoriating or rebuking plaintiff for failing to seek continued disability benefits, but offers no affidavits, for example, to support the assertion. It is therefore doubtful that the motion triggers a burden on plaintiff's part to come forward with evidence supporting his claim. If so, Count III would also be subject to summary judgment for plaintiff's failure to do so.