**David BURRELL, Plaintiff,**

v.

**CUMMINS GREAT PLAINS, INC., Defendant.**

**No. 4:03–CV–40355.**

United States District Court, S.D. Iowa, Central Division.

July 7, 2004.

Thomas M. Werner, Des Moines, IA, for Plaintiff.

Lora L. McCollom, Gonzalez Saggio & Harlan LLP, West Des Moines, IA, for Defendant.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

Before the Court is Defendant's Motion for Summary Judgment (Clerk's No. 10) and Motion to Strike (Clerk's No. 25) in this employment discrimination action brought by Plaintiff David Burrell ("Burrell") against Defendant Cummins Great Plains, Inc. ("Cummins"). Plaintiff is represented by Thomas Werner; Defendant is represented by Lora McCollom. The parties have not requested a hearing nor does the Court deem one necessary. The matter is fully submitted and ready for disposition.

## I. MOTION TO STRIKE

As a preliminary matter, the Court addresses Defendant's Motion to Strike. At issue in the motion are two documents contained in Plaintiff's appendix filed with his resistance to summary judgment: (1) a November 2002, Westlakes HyVee Pharmacy Newsletter devoted to diabetes awareness; and (2) a document entitled "Work-site Accommodation Ideas for Individuals with Diabetes" published in January 2002 by Job Accommodation Network, a service of the Office of Disability Employment Policy of the United States Department of Labor.

■ Cummins argues that despite Defendant's requests for such documents during discovery, Burrell failed to produce those documents in compliance with Fed. R.Civ.P. 26; and, therefore, Burrell is precluded from using them at trial, hearing, or on a motion pursuant to Fed.R.Civ.P. 37(c)(1). Cummins alternatively argues the documents constitute inadmissible hearsay under Fed.R.Evid. 802.

Burrell resists the motion, arguing a party is not limited to documents exchanged during discovery when resisting a motion for summary judgment. Burrell further argues Local Rule 56.1 allows exhibits to be used in resistance to a summary judgment motion. Burrell does not address the hearsay issue.

■ The exhibits contain general information about diabetes. No information contained in those documents refers specifically to Burrell. The Court has an insufficient record upon which to measure the value or authoritative quality of the exhibits. The Court finds those documents lack proper foundation and constitute inadmissible hearsay for which there is no exception.[1] Defendant's Motion to Strike is **granted**.

## II. UNDISPUTED FACTS

David Burrell was diagnosed with Type I diabetes when he was fourteen years old. He is insulin-dependent, which requires daily insulin injections and blood sugars monitoring to prevent hypoglycemia (low blood sugars) or hyperglycemia (high blood sugars). Depending on his blood sugars level, Burrell may need to eat to raise his blood sugars, or "bolus" (administer more insulin) to lower his blood sugars. If his blood sugars become too low, Burrell may have a low blood sugars ("LBS") episode, which presents with symptoms such as dizziness, confusion, and changes in his level of consciousness. Burrell also suffers from hyperthyroidism, which is controlled by daily medication. Because he has Type I diabetes, Burrell has been advised to have regular medical check-ups, as well as annual foot and eye examinations.

Burrell began working for Defendant Cummins[2] on April 2, 1990, as an "upfit"

---

1. "[A] motion to strike is appropriate if documents submitted in support of a motion for summary judgment contain inadmissible hearsay or conclusory statements, are incomplete, or have not been properly authenticated." *Spector v. Experian Info. Servs., Inc.*, 321 F.Supp.2d 348, 352, 2004 WL 1242978, at *4 (D.Conn.2004).

 A motion to strike will also be granted when it challenges documentary evidence that was submitted in support of or in opposition to a summary judgment motion, but which has not been properly authenticated. It is irrelevant that the documents

 may in the future be properly authenticated at trial through a witness. The documents must be properly authenticated in order to be considered by the court at summary judgment stage, in the face of an objection. *Dedyo v. Baker Eng'g N.Y., Inc.*, 1998 WL 9376, at *4–5 (S.D.N.Y. Jan.13, 1998) (citing 11 James Wm. Moore et al., Moore's Fed. Prac. ¶ 56.14[4][a] (3d ed.1997)).

2. In his deposition, Burrell stated that when he was hired, the company was named Mid-Western Power, which was later bought by Cummins.

technician customizing engines. The duties of an upfit technician include (1) driving a forklift to move the engines around the facility; (2) running diesel equipment for testing; (3) driving company vehicles to customers' properties to troubleshoot and repair diesel engines; (4) utilizing cranes, welders, and other power equipment; and (5) lifting heavy equipment parts.

While employed at Cummins, Burrell had several LBS episodes which required intervention. On December 29, 1993, on his way to work, Burrell was driving on the interstate and had an LBS episode. His car hit the guardrail and went into the median. He had his car towed to Cummins and began his shift. However, a Cummins' supervisor took Burrell to a clinic. Burrell told the doctor that he had taken his insulin that morning but did not eat. The doctor told Burrell not to drive and to go get something to eat right away. He was also told he needed to better monitor his blood sugars and to follow-up with Dr. Michael Harvey.

On February 22, 1994, Cummins' operations manager, Dale Koenig, called Dr. Harvey regarding Burrell's condition. He reported that Burrell had experienced several LBS episodes at work in the previous four months and that, during one episode, he had a minor car accident with a company car. The doctor drafted a contract-like plan Burrell was to follow to prevent and control LBS episodes. The plan included (1) not to drive and to ask for help from fellow employees; (2) to intake adequate food at breakfast, 10:00 a.m., lunch, and 3 p.m., and to have glucose tablets available as needed; (3) to check blood sugars before eating at 6:30 or 7:00 a.m., again at 10:00 a.m., lunchtime, two hours after lunch, four hours after lunch, and at bedtime; (4) his blood sugars would be available for his supervisor to review; (5) not to work if blood sugars were under 80; (6) if blood sugars were under 80, to eat something and retest before resuming work; and (7) to follow-up at the doctor's office in a week with his blood sugars scores.

In addition, Dr. Harvey spoke at length with Burrell, informing him that he was placing himself, as well as his doctor and employer, at severe risk of liability because of his noncompliance. Dr. Harvey told Burrell that he needed to assume the care of his diabetes and appropriate monitoring to assure that he could perform his job safely for both himself and his fellow employees. Burrell agreed to follow the guidelines and signed the document. Dr. Harvey discussed the guidelines with Koenig, who also agreed to those terms.

Burrell complied with this plan for about one month, keeping regular appointments through March 23, 1994. At that time, Dr. Harvey told Burrell to report back in one month; however, Burrell did not return until June 23, 1994, when he developed diabetic ketoacidosis[3] and was hospitalized for three days. He returned to work on June 27, 1994, but failed to eat or monitor his blood sugars and had an LBS episode. The paramedics were called and gave Burrell dextrose intravenously. He was taken to Mercy Hospital, where he was given some food and discharged. He was instructed to follow up with his doctor.

However, Burrell did not go to see Dr. Harvey until December 4, 1994. Dr. Har-

---

3. "Diabetic ketoacidosis (DKA) results from grossly deficient insulin availability .... In type I [diabetes mellitus] patients, DKA is commonly precipitated by a lapse in insulin treatment or by an acute infection, trauma, or infarction that makes usual insulin treatment inadequate." The Merck Manual, Sec. Endocrine and Metabolic Disorders, Disorders of Carbohydrate Metabolism, Diabetic Ketoacidosis, *available at* http://www.merck.com/mrkshared/mmanual/section2/chapter13/13b.jsp.

vey commented about Burrell's failure to come in on a monthly basis and that it had been more than five months since Burrell last had his blood sugars checked. He also noted that Burrell never followed up after his June hospitalization as he had been instructed.

On December 26, 1995, Burrell had an LBS episode at Cummins and was taken to the hospital. Burrell told the doctor that he had taken his insulin that morning but skipped breakfast. He was given intravenous and oral glucose, his blood sugars elevated, and he was discharged.

On February 7, 1996, Burrell called Dr. Harvey requesting an insulin refill. Dr. Harvey reminded Burrell he had not been in to have his blood sugars checked in more than six months and that he was well aware he needed ongoing medical care every two or three months. Dr. Harvey stated that he was surprised Burrell's employer allowed him to work without continued monitoring. Dr. Harvey gave Burrell a one-month refill and had Burrell schedule an appointment for the following week. There is no mention of the December 1995 LBS episode in Dr. Harvey's notes.

During his work shift on June 30, 1997, Burrell had another LBS episode and was taken to the hospital emergency room. Cummins issued Burrell a written discipline for endangering himself and others due to improper diet and/or alcohol consumption causing his diabetic reaction. Burrell was warned that the next offense of improper medical maintenance would result in restrictions of duties such as driving forklifts and company vehicles. He was further warned that continued conduct may lead to termination. On July 2, 1997, Burrell went to see Dr. Harvey, who encouraged him to follow up on his blood sugars monitoring every three months.

Again in early September 1997, while returning from a client visit with a coworker, Burrell had an LBS episode. Burrell was driving 70 miles per hour when the episode occurred. His co-worker was able to induce Burrell to swerve to avoid an accident. After stopping for food, Burrell felt better and continued driving. Due to the June and September episodes, Cummins issued Burrell a written discipline, restricting him from driving company or customer vehicles. The discipline further warned that the next offense of improper medical maintenance would result in duty restrictions, such as driving a forklift or company vehicles, and that continued conduct may lead to termination.

Just days later, on September 30, 1997, Burrell had another LBS episode at Cummins and was issued a written discipline. Cummins required a review of Burrell's diabetic medical maintenance and restricted Burrell's driving privileges. Cummins indicated the restriction would be reviewed in six months. Medical records show that Burrell was next seen by a physician in January 1998; however, there is no mention of the September 1997 LBS episode in the doctor's notes.

During the relevant time period, Burrell also worked part time at Dahl's Food Store ("Dahl's") as a night stock clerk. On December 28, 2001, at 1:30 a.m., Burrell had an LBS episode. Paramedics treated him, and his daughter drove him home. Burrell went to see Dr. Harvey on February 17, 2002, and told him about the December episode but indicated that he was able to "self-care" through it. Dr. Harvey encouraged better compliance with his diabetes management.

During the spring of 2002, Burrell testified that he was busier than usual at Cummins, working nights at Dahl's, and moving his home. As a result of his busy schedule, he was not testing his blood sugars. On April 18, 2002, Burrell had an LBS episode while he was driving and caused an accident involving other vehi-

cles. Burrell was placed under arrest and issued several citations. Because of the accident, Cummins again suspended Burrell's driving privileges, which meant other employees were required to perform those functions of Burrell's job.

On April 28, 2002, Burrell went to see Dr. Harvey and told him about the car accident. He explained that he was busy running errands and did not have time to eat. He also told the doctor about two other episodes at Cummins in January and February, which were both caused by his failure to eat. Dr. Harvey remarked that Burrell's diabetes was poorly managed and that Burrell needed to be more aggressive controlling it. Dr. Harvey referred Burrell to endocrinologist Dr. Lori Larson.

On June 4, 2002, concerned about Burrell's multiple low sugars episodes, Galin Hodges, Cummins' Human Resources Manager, wrote a letter to Dr. Harvey, asking about the management of Burrell's diabetes. The letter stated as follows:

Dear Dr. Harvey,

Dave Burrell, ... who is a patient of your [sic], is an employee of ours. From time to time, he has had some rough episodes, while at work, pertaining to his diabetes, leading us to think he may be non-compliant with appropriate medical strategies. Recently he had a situation occur on his way home from work, when he ran off the road causing pretty drastic damage to his car, and causing several other cars to run off the road. I am writing to obtain some assurances that Dave Burrell, who is a technician for Cummins Great Plains, Inc., can safely perform work, and work under the conditions provided by our work environment. I have listed, on an attached sheet, some of the activities that he performs on a daily basis. Would you please respond to each question in the space provided by letting us know if you feel he can safely perform this type of work, and return the attached page to me?

The five questions were:

1. Mr. Burrell will on occasion utilize a forklift to move engines around our facility, sometimes putting them on/off shelving units fifteen to twenty feet off the ground.

2. Mr. Burrell works on diesel engines and generators, and will from time to time run this equipment to test.

3. Mr. Burrell will from time to time, be required to visit a customer's property to troubleshoot and repair diesel engines. This might require him to drive a vehicle to get to the customer's property.

4. Mr. Burrell will utilize cranes, forklifts, and other power equipment, such as welders, in the performance of his daily activities.

5. Mr. Burrell will be required to lift parts, which could weigh up to fifty pounds on a frequent basis.

Dr. Harvey did not respond to the letter. Burrell went to see Dr. Larson on June 17, 2002. She recommended that Burrell discontinue driving until his blood sugars were better controlled and that once better controlled, he must always check his blood sugars before getting behind the wheel. She asked him to record his blood sugars, mail the record to her, and follow up in July.

Burrell had two serious LBS episodes at home in July 2002; the paramedics were called to the house for one of the episodes, and Burrell's mother was able to treat him through the other. On July 17, 2002, Burrell had another LBS episode at Cummins. After that episode, Cummins' operations manager, Dale Koenig, told Burrell he was being placed on leave and gave Burrell a copy of the same letter and questionnaire that were sent to Dr. Harvey. Koenig told

Burrell he could not return to work until a physician completed the form and provided assurance that Burrell was able to perform his work without the worry of having an LBS episode. Burrell brought the letter to Dr. Larson's office.

On July 24, 2002, Burrell was seen by a physician's assistant in Dr. Larson's office, Nichole Bussanmas. He told Bussanmas about his suspension from Cummins and his desire to get back to work. Bussanmas noted that Burrell's blood sugars were still variable and his diabetes was poorly controlled. However, she suggested that he "was not having nearly the low blood sugars he was" and indicated that she thought he could go back to work. She wrote a note stating he "may return to work at this time to his previous position. He will still be making minor adjustments and checking blood sugars frequently." This note did not satisfy Cummins' concerns, and Burrell was not reinstated.

On July 29, 2002, Dr. Larson responded to Cummins' letter and questions.

Dear Mr. Hodges:

David Burrell was initially seen by myself in June 2002 for poorly controlled diabetes. We did switch his insulin regimen. He was seen by our physician assistant on 7–24–02. He brought in 2 weeks worth of blood sugars. He is checking his blood sugar as many as 7–8 times/day. Most of his blood sugars are running high, although he will have an occasional low blood sugar before breakfast. The physician's assistant told the patient that she felt it would be safe for him to return to work if he checks his blood sugars regularly. To address the specific points in your letter, I would recommend that Mr. Burrell check his blood sugar before he utilizes the forklift, gets behind the wheel to drive to customers [sic] property, utilizes cranes or other power equipment such as welders and periodically check his blood sug-

ars during the day before lifting heavy objects or running test equipment. Along [sic] as he is allowed to test his blood sugars frequently and eat any time he feels he is running too low, then I would think it would be safe for him to return to work at this time. If you have any questions or concerns, please do not hesitate to contact me.

Dr. Larson did not specifically answer the five questions but simply wrote across the page, "if patient checks blood sugars frequently throughout the day, I think he can return to work."

On August 1, 2002, Hodges wrote another letter to Dr. Larson.

Dear Dr. Larson:

Thank you for your letter dated July 29, 2002 regarding the medical status of your patient, David Burrell. Your letter raised additional questions that need further clarification before Mr. Burrell returns to the workplace.

It is our understanding from your letter that it is safe for Mr. Burrell to utilize a forklift, drive to customers' property, utilize cranes or power equipment, lift heavy objects and test-run diesel engines and generators if he tests his blood sugar frequently and eats anytime he feels his blood sugar is running too low.

Our problem with this recommendation is that Mr. Burrell had been testing his blood sugar frequently, was in a position that he could eat whenever he needed (although his fondness for donuts is probably non-compliant with his diabetic diet), yet he continued to have episodes while at work or while driving. As you are aware, the episode which occurred while he was driving resulted in Mr. Burrell wrecking his car as well as several other cars.

In addition, it is apparent that Mr. Burrell does not realize when his blood

sugar is running too low and therefore cannot self-assess his need to eat as suggested in your letter. For example, on more than one occasion in the past several months, co-workers became aware that Mr. Burrell was having a diabetic reaction of some sort (we are not trained medical personnel and cannot distinguish between an insulin reaction and a high blood sugar reaction). During these episodes, Mr. Burrell becomes very obstinate and unable to communicate. Co-workers have had to guess that these were episodes of low blood sugar and had to force Mr. Burrell to drink a soda with glucose tablets. Again, although we are not trained medical professionals, it was apparent that Mr. Burrell could not return to work immediately after the glucose was given.

During the last episode on July 9, 2002, Mr. Burrell's father showed up at the workplace as he was concerned about his son. His father relayed that Mr. Burrell had another episode on July 4, 2002 that took Mr. Burrell over an hour and a half to snap out of [sic]. What is more troubling is that both of these July episodes occurred after you saw Mr. Burrell in June, yet there is no indication that these serious reactions were reported to the physician's assistant as these were much more than "an occasional low blood sugar before breakfast" as reported in your letter.

Based on the above, we do not feel that the information being provided to you by Mr. Burrell and the recommendations you provided to us are reliable assurances that Mr. Burrell's diabetes is sufficiently controlled to work in his current position. At this time, we ask that you please clarify your letter with regard to the following concerns:

1. Were you aware of the insulin reactions Mr. Burrell had on July 4th and July 9th?

2. Can you assure us that the frequency, intensity, Mr. Burrell's lack of awareness and the length of time it took for Mr. Burrell to recover from these last episodes does not pose a safety concern in light of Mr. Burrell's current job responsibilities?

3. Because Mr. Burrell at times is working or driving alone and because our employees are not trained to take or assess blood sugar, identify the difference between an insulin reaction or a high blood sugars reaction nor assess when Mr. Burrell has recovered from an episode, is it safe for Mr. Burrell to rely on co-workers to identify when he is having a reaction (since he cannot) and force him to take glucose?

Thank you in advance for your assistance with these concerns.

On August 5, 2002, Dr. Larson responded to Hodges' August 1, 2002, letter.

Dr. Mr. Hodges:

This is regarding Mr. David Burrell. I appreciate your letter dated 8–1–02. No, I was not aware of his severe insulin reactions on 7–4–02 and 7–9–02. I saw him in clinic on 8–5–02 and he is checking his blood sugars 2 to 8 times a day. In the past 2 weeks, he has had 3 low blood sugars but not serious. At this point, I cannot guarantee that he will never have another insulin reaction at work. I recommend frequent blood sugar checks at work, especially before operating equipment. If you have any questions, please contact me.

Dr. Larson referred to Hodges' letter in her August 5, 2002, progress notes and restated her position regarding Burrell's potential for LBS episodes.

S: This 46 [year old] man returns today for a follow-up of diabetes mellitus Type I which he has had for approximately 32 years. I saw him initially in

June and switched him to Lantus and Humalog. He was then later seen by the physician assistant.... He denies any significant low blood sugars requiring assistance from another person since his initial visit with myself in June 2002. However, I have received a letter from Gaylon [sic] Hodges, the human resource manager, who states that he had a reaction on 7–4–02 and 7–9–02 which were very serious. They are very concerned about his ability to function at work, as he in the past has had low blood sugars despite checking blood sugars frequently and being able to eat whenever he needed to. Apparently, he has severe hypoglycemia unawareness and has had problems at work having to be treated by his co-workers. In addition, I am aware that he did wreck his car, as well as, several other cars during a severe low blood sugar reaction prior to our switching him to Lantus and Humalog.

. . . .

A/P: Diabetes mellitus Type 1[sic] with poor control by hemoglobin Alc and very erratic blood sugars on his current regimen. He does tend to run high throughout the day, and therefore, I am recommending that he increase his Lantus to 24 [units]. He is going to record blood sugars and mail them in for our review in 2 weeks. Regarding his job, I cannot guarantee that he will never have another insulin reaction, all I can do is recommend frequent blood sugar checks.

On August 12, 2002, Hodges wrote a letter to Cummins' long term disability ("LTD") insurance carrier, Mutual of Omaha. Therein, he stated that due to the "safety sensitive" nature of Burrell's work position and the lack of assurances from his doctor, specifically his doctor's inability to guarantee Burrell would not present a safety hazard to himself, his co-workers, or customers, Cummins recommended that

Burrell file an LTD claim. Hodges submitted the LTD employer's statement on August 12, 2002. Koenig completed the supervisor's statement on August 21, 2002, and Burrell completed the required employee's statement on September 3, 2002.

Dr. Larson completed the physician's LTD statement on September 4, 2002. In that statement, Dr. Larson remarked, "Patient has had severe episodes of hypoglycemia at work and while driving [a] car. [He] should always check blood sugars before driving [a] car. [He] should not perform work which could harm himself or others while hypoglycemic. Hopefully fewer episodes of hypoglycemia although with diabetes, there is always risk." Dr. Larson also checked the box indicating that Burrell had not achieved maximum medical improvement. She also indicated that fundamental improvement could be expected in six months to one year but was "uncertain" about when she expected Burrell could return to his prior level of functioning because he was always at risk for low blood sugars. She noted the treatment plan for Burrell to return to work was "to be determined by Galin Hodges."

On September 23, 2002, Burrell's attorney wrote a letter to Cummins requesting reinstatement, arguing Dr. Larson's statements provided adequate assurances. The letter further indicated that Burrell would sign a waiver absolving Cummins of any liability in the event he should be injured on the job due to a diabetic seizure. Burrell's attorney also warned that if Cummins did not reinstate Burrell, he would file a claim with the ICRC and the EEOC.

In the meantime, Burrell continued to work at Dahl's as a part-time night stock clerk and went to full time in November 2002. On January 7, 2003, Hodges sent Burrell a letter indicating that Cummins had submitted the LTD claim on his behalf and stated, since there were no ade-

quate assurances from his doctor about his ability to safely return to his position, Cummins was terminating Burrell's employment. Burrell received long-term disability insurance payments from Mutual of Omaha from January 2003 until July 2003. In July 2003, Burrell left Dahl's and took a full-time position at Des Moines Flying Service as a shipping and receiving sales clerk.

Burrell filed claims with the ICRC and the EEOC alleging Cummins discriminated against him in violation of the ICRA and the ADA. He received right to sue letters from both the ICRC and the EEOC and commenced a lawsuit in Iowa District Court for Polk County. Cummins removed the action to federal court and filed the present motion for summary judgment, arguing Burrell cannot prove a prima facie case of discrimination under the ADA. In the alternative, Cummins argues it had a legitimate nondiscriminatory reason for its actions.

## III. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P.

56(c)). "To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case on which it has the burden of proof at trial." *Cont'l Grain Co. v. Frank Seitzinger Storage*, 837 F.2d 836, 838 (8th Cir. 1988).

The court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Niagara of Wis. Paper Corp. v. Paper Indus. Union–Mgmt. Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. " 'On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Econ. Housing Co. v. Cont'l Forest Prods., Inc.*, 757 F.2d 200, 203 (8th Cir.1985).

"[S]ummary judgment should seldom be granted in discrimination cases." *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir.2000). "Summary judgments should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson v. Minn. Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991) (citing *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364

(8th Cir.1987)). However, in discrimination cases, the plaintiff is not entitled to survive summary judgment merely by establishing a prima facie case. *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 365 (8th Cir.1994) (citing *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1111 (1st Cir.1989)). The "plaintiff's evidence must be sufficient to raise a genuine issue of material fact regarding defendant's reason for the employment action taken." *Id.; see also Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir.1999) ("[T]here is no 'discrimination case exception' to the application of Fed.R.Civ.P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial.").

## IV. DISCUSSION

### A. Discrimination Under the ADA

In this action, Burrell alleges Cummins discriminated against him by wrongfully terminating him in violation of the ADA and the ICRA.[4] "The ADA prohibits an employer who is a 'covered entity' from discriminating 'against a qualified individual with a disability because of the disability of such an individual.' " *Burroughs v. City of Springfield,* 163 F.3d 505, 507 (8th Cir. 1998) (quoting 42 U.S.C. § 12112(a)). The plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id.*

### B. Prima Facie Case Under the ADA

To establish a prima facie case of discrimination under the ADA, Burrell must prove that (1) he is a disabled person within the meaning of the ADA; (2) he was qualified for the essential functions of his job, with or without reasonable accommodation; and (3) "because of" his disabili-

ty, he suffered adverse employment action. *Id.; see also Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1087 (8th Cir. 2001) (citing *Kiel v. Select Artificials Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)); *Brown v. Farmland Foods, Inc.*, 178 F.Supp.2d 961, 971 (N.D.Iowa 2001). Summary judgment is appropriate if a plaintiff fails to establish any element of a prima facie case. *Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1086 (8th Cir. 2000).

If Burrell establishes a prima facie case, "a rebuttable presumption of discrimination emerges" and Cummins "must articulate a legitimate, nondiscriminatory reason for the adverse employment action taken against him." *Id.* If Cummins rebuts the presumption, the burden shifts to Burrell to show Cummins' nondiscriminatory reason was pretextual. *Id.*

### (1) *Disabled Within the Meaning of the ADA*

Burrell has the initial burden of proving he suffers from a disability within the meaning of the ADA. 42 U.S.C. § 12102(2) (2000). The statute defines a disability as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." *Id.*

### (i) *Physical or Mental Impairment that Substantially Limits a Major Life Activity*

■ "An 'impairment' is any physiological disorder, cosmetic disfigurement, or anatomical loss affecting one of the body's systems, or any mental disorder." *Weber*

---

4. Iowa courts traditionally turn to federal law for guidance in evaluating the ICRA as it was modeled after Title VII. *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citing *King*

*v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983)). Therefore, the Court's ADA analysis applies to both Burrell's ADA and ICRA claims.

v. *Strippit, Inc.*, 186 F.3d 907, 915 (8th Cir.1999) (citing 29 C.F.R. § 1630.2(h)). However, a disability analysis hinges on whether the plaintiff's impairment substantially limits one or more major life activities. *Toyota Motor Mfg. Ky. Inc. v. Williams*, 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) ("Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity."). A case-by-case analysis is required since an impairment which disables some individuals may not disable others. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

▬ The ADA does not delineate a "major life activity" nor does it define the term "substantially limits"; however, the EEOC guidelines provide direction. "Major life activities include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 598 (8th Cir.1998) (quoting 29 C.F.R. § 1630.2(i)). "An impairment is 'substantially limiting' if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948–49 (8th Cir.1999). In determining whether an individual is substantially limited in a major life activity, the court will consider "(1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact." *Id.* at 949 (citing 29 C.F.R. 1630.2(j)(2)(i), (j)(2)(ii)).

▬ Burrell argues the severity of his impairment impacts his ability to eat and sleep as well as other major life activities including (1) the inability to enroll in the military; (2) insulin dependence; (3) constant blood sugars monitoring; (4) acute symptoms during LBS episodes, including heart rate changes, fatigue, loss of control of leg mobility, loss of speech, and loss of thought processes; (5) frequent urination during high blood sugars episodes; and (6) hypothyroidism. Burrell also states that his physician advised him that he is at risk for heart disease, nerve damage, kidney disease, high blood pressure, blindness, and strokes, and that he will likely die from a diabetes related condition. Burrell further argues that "virtually all of the circuit courts that have addressed this issue have concluded that Type I insulin-dependent diabetics with life-long symptoms do suffer from a substantially limiting impairment under the ADA."

For purposes of summary judgment, Cummins acknowledges diabetes constitutes a physical impairment but argues that in Burrell's case, his impairment does not substantially limit a major life activity and, therefore, does not constitute a disability under the ADA. *Kells v. Sinclair Buick–GMC Truck, Inc.*, 210 F.3d 827, 831 (8th Cir.2000) (recognizing insulin-dependent diabetes is an impairment within the meaning of the ADA) (citing *Burroughs*, 163 F.3d at 507). Cummins also disputes the claim that "virtually all" circuits having dealt with the issue have concluded Type I diabetics suffer from a substantially limiting impairment under the ADA. Rather, Cummins argues, that determination must be made on a case-by-case basis. *Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763, 769–70 (8th Cir.2004) ("[W]e are reminded 'Congress intended the existence of a disability to be determined in [ ] a case-by-case manner.' ") (quoting *Toyota Motor*, 534 U.S. at 196, 122 S.Ct. 681). Cummins further argues that Burrell does not allege how his

impairment substantially limits any of his major life activities, rather, he points to potential complications of Type I insulin-diabetes from which he does not currently suffer and incorrectly argues he is disabled within the meaning of the ADA.

Burrell argues that other courts have concluded that Type I insulin-dependent diabetes constitutes a substantially life limiting condition. *Nawrot v. CPC Int'l*, 277 F.3d 896, 905 (7th Cir.2002) (concluding, *under the facts of the case*, plaintiff's Type I "brittle" diabetes symptoms severely limited his ability to think and care for himself); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 926 (7th Cir.2001) (finding that *plaintiff's serious ailments*, precipitated by his Type I diabetes, limited the major life activity of eating).[5] The Court disagrees that these cases stand for the principle that Type I diabetes is per se a substantial limitation on a major life activity and declines to adopt that theory. An examination of the cases demonstrates the relatively common knowledge that diabetes has widely varied impact on individual sufferers, and it changes throughout their lives.

In *Lawson*, the court reasoned that plaintiff Lawson's diabetes affected " 'many of the organ systems in his body,' including his 'metabolic, vascular, urinary, and reproductive systems as well as his joints and eyes,' and negatively impacts his depression and high blood pressure." *Lawson*, 245 F.3d at 924. The court distinguished Lawson's more severe restrictions from those of other individuals who must follow simple dietary restrictions required due to medical conditions. *Id.* (cit-

ing *Weber*, 186 F.3d at 914). The *Lawson* court recognized, however, that a determination of disability under the ADA is not the same in every case; rather, it is an "individualized inquiry based on the particular circumstances of each case." *Id.* at 926.

In *Nawrot*, plaintiff's "brittle" diabetic symptoms included diabetic retinopathy, fading erectile ability commonly associated with diabetes, limited joint mobility syndrome, causing swelling in the hands and wrists, and pain in the elbows, knees, and feet, proteinuria, as well as other ailments such as high blood pressure and depression. *Nawrot*, 277 F.3d at 905.

The facts of the present case are distinguishable from *Lawson* and *Nawrot*. Here, Burrell does not clearly propose which major life activity is substantially limited by his diabetes. In fact, he argues that under the "notice pleading" requirement, he is only required to allege a disability in his complaint. While that may be true for purposes of stating a claim in a complaint, *see* Fed.R.Civ.P. 8(a), to survive summary judgment on a claim of discrimination under the ADA, a plaintiff has the burden of proving a prima facie case of discrimination, which includes demonstrating a major life activity is substantially limited by his impairment. *Kellogg*, 233 F.3d at 1086.

Burrell indirectly suggests the major life activities of "eating and sleeping" are *affected* by his impairment, yet he has presented no evidence nor does the record suggest that these activities are affected,

5. Burrell also cites *Arnold v. United Parcel Service*, 136 F.3d 854, 864 (1st Cir.1998), reasoning, for purposes of the ADA, an individual's impairment must be considered without ameliorating measures; however, Arnold was overruled by *Sutton v. United Air Lines, Inc.*

Looking at the Act as a whole, it is apparent that if a person is taking measures to cor-

rect for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act.

*Sutton*, 527 U.S. at 482, 119 S.Ct. 2139.

or more importantly to the degree that they are substantially limited. Rather, Burrell simply discusses other cases in which diabetes has been found to substantially limit a major life activity but does not attempt to show how the facts of those cases are similar to the facts of the present case. As previously stated, the determination of a disability must be made on a case-by-case basis. *Orr v. Wal–Mart Stores, Inc.,* 297 F.3d 720, 724 (8th Cir.2002) ("[A] diabetic is not per se disabled but must demonstrate his condition substantially limits one or more major life activities").

The limitations Burrell is currently afflicted with—insulin dependence, constant blood sugars monitoring, and erratic changes during LBS episodes—are certainly inconvenient and personally troublesome, but they do not rise to the level of a substantial limitation of a major life activity. *Toyota Motor,* 534 U.S. at 198, 122 S.Ct. 681 ("We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term."); *Orr,* 297 F.3d at 724 ("[A] diabetic is not per se disabled but must demonstrate his condition substantially limits one or more major life activities") (citing *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139); *Cody,* 139 F.3d at 598 (reasoning evidence that impairments cause difficulties in life does not rise to the level of a substantial limitation on a major life activity).

Burrell suggests that he is substantially limited because of the *potential* risk of developing heart disease, nerve damage, kidney disease, high blood pressure, blindness, and strokes because of diabetes. However, Burrell is not currently afflicted with those conditions; rather, they represent hypothetical or potential conditions and therefore do not constitute a disability. *Sutton,* 527 U.S. at 481, 119 S.Ct. 2139 ("Because the phrase 'substantially limits' appears in the Act in the present indicative verb form, we think the language is properly read as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability.").

■ The Court must also consider the positive and negative effects of mitigating measures when considering whether a plaintiff is disabled under the ADA. *Id.* at 482, 119 S.Ct. 2139. Mitigating measures in Burrell's case include daily insulin and blood sugars monitoring, annual foot and eye exams, and dietary restrictions. While these measures promote maintenance of his diabetes, Burrell suggests the negative effects of these measures are substantially limiting. For example, Burrell states that wearing an insulin pump is substantially limiting because he must wear it at all times, even when he sleeps. However, the insulin pump was recommended, not required, by Dr. Larson as a more flexible insulin regimen for his busy schedule. Furthermore, Burrell did not start using the insulin pump until February 2003, after he was terminated by Cummins. If the Court found that seeing a physician annually for foot and eye exams, monitoring blood sugars, and taking medication constitute substantial limitations on a major life activity, the Court would be impermissibly expanding the definition of disability under the ADA. *See Sutton,* 527 U.S. at 488, 119 S.Ct. 2139 (finding that the number of persons whose impairments are largely corrected by medication and other mitigating measures were not intended to be included by Congress as disabled under the ADA).

The measures Burrell must take to maintain his diabetes, while inconvenient, do not constitute more than moderate limi-

tations on any major life activity. *Weber,* 186 F.3d at 914. Although Burrell states several ways in which his diabetes has *impacted* his life, he does not state any way in which it substantially limits a major life activity.

In addition, Burrell stated at his deposition that during his employment at Cummins, *he never thought he was disabled* because he could do everything, but he knew his diabetes was a *factor* in everything in his life. He also denied that his condition limited his abilities to see, hear, breathe, or learn. He further denied, with the exception of *during* an LBS episode, that he was limited in his abilities to walk, care for himself, or work. Burrell admitted that any limitations he experiences are temporary and do not affect him all the time. Even severe symptoms which are episodic do not constitute a substantial limitation on a major life activity. *EEOC v. Sara Lee Corp.,* 237 F.3d 349, 353 (4th Cir.2001) (finding a plaintiff who suffered weekly epileptic seizures which caused shaking, kicking, salivating, and, on at least one occasion, bedwetting, did not constitute a substantial limitation on a major life activity because holding "that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds").

For the above stated reasons, Burrell does not present evidence that his impairment substantially limits a major life activity; therefore, his impairment does not meet the definition of a disability within the ADA.

### (ii) *Record of Impairment*

■ A plaintiff can alternatively show a disability within the meaning of the ADA if he has a record of such an impairment. "In order to have a record of disability under the ADA, a plaintiff's medical documentation must show that [he] has a histo-

ry of, or has been misclassified as having, a physical or mental impairment that substantially limits one or more major life activities." *Weber,* 186 F.3d at 915 (citing 29 C.F.R. § 1630.2(k)); *Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 961 (8th Cir.2000). The record which indicates a plaintiff has or had a substantially limiting impairment must be one relied upon by the employer in making the employment decision. 29 C.F.R. § 1630.2(k). Submission of a medical diagnosis of an impairment is insufficient proof of a record of disability. *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (citing *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139).

■ Burrell argues he also qualifies as having a disability under the ADA because he has a record of an impairment. He points to his medical records that show a thirty-three year history of diabetes, his hospitalizations, emergency medical treatment, and the fact that he is now forced to wear an insulin pump. Burrell asserts that in this case, just as in *Webner v. Titan Distribution, Inc.,* there is sufficient evidence to support a record of disability. *Webner v. Titan Distribution, Inc.,* 101 F.Supp.2d 1215, 1223 (N.D.Iowa 2000), *rev'd on other grounds,* 267 F.3d 828 (8th Cir.2001).

*Webner* is distinguishable from the present case. First, the *Webner* court was ruling on a post-trial motion for judgment as a matter of law, not a motion for summary judgment. *Id.* Second, the court found, based on the evidence adduced at trial—plaintiff's three back surgeries, a one and a half year leave of absence due to his back injury and the testimony of supervisors that they were concerned about the plaintiff's ability to do his job before his last surgery—there was sufficient evidence for a jury to find a record of a disability. *Id.* at 1233.

Distinct from the facts in *Webner*, the facts of this case do not support a finding that Burrell had a record of an impairment that substantially limited a major life activity. Although Burrell was hospitalized during the relevant period of employment, it was a single episode. Cummins demanded documentation from Burrell's doctor regarding his fitness to return to his work for safety reasons. The only record of an impairment in this case is Burrell's record of diabetes, which does not support a finding that he is substantially limited in a major life activity. Nothing in this record suggests the employment action was taken by Cummins based upon a record of an impairment as contemplated under the law.

### (iii) *Regarded as Disabled*

Burrell argues in the alternative that Cummins regarded him as disabled by viewing his diabetes in a negative light, putting him on involuntary leave, refusing to reinstate him, and demanding a guarantee from his doctor that he would not present a safety hazard. Burrell also argues proof that Cummins regarded him as disabled is demonstrated by Cummins' recommendation he file an LTD claim.

Cummins states that suggesting Burrell should submit an LTD claim does not create a genuine issue of material fact as to whether Cummins regarded Burrell as disabled. *Taylor*, 214 F.3d at 961 (concluding that sending an employee a get well card and offer of medical leave did not amount to treating the employee as substantially limited in a major life activity); *Cody*, 139 F.3d at 598–99 (concluding that an offer of medical leave and requiring a mental evaluation before returning to work did not demonstrate defendant regarded plaintiff as disabled); *Brown v. Des Moines Ind. Cmty, Sch. Dist.*, 682 N.W.2d 81 (Table), 2004 WL 433853, at *4 (Iowa Ct.App. Mar.10, 2004) (finding employer's reference to LTD benefits did not create a genuine issue of fact that plaintiff was "regarded as" disabled).

An individual may satisfy the definition of 'being regarded as having a disability' in any one of three ways:

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

(2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

. . . .

Therefore, if an individual can show that an employer or other covered entity made an employment decision because of a perception of disability based on 'myth, fear or stereotype,' the individual will satisfy the 'regarded as' part of the definition of disability. If the employer cannot articulate a non-discriminatory reason for the employment action, an inference that the employer is acting on the basis of 'myth, fear or stereotype' can be drawn.

29 C.F.R. pt. 1630, App. § 1630.2(1). *See also Sutton*, 527 U.S. at 489, 119 S.Ct. 2139 (" 'Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from impairment.' ") (quoting *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). " 'A person is 'regarded as having' a[sic] such an impairment if others treat her as if she is disabled.' " *Cody*, 139 F.3d at 599 (citing *Webb v. Mercy Hosp.*, 102 F.3d 958, 960 (8th Cir.1996)).

■ The Court now considers whether Cummins "regarded" Burrell as substantially limited in the major life activity of working.[6] When considering the ability to work as a major life activity, "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton,* 527 U.S. at 491, 119 S.Ct. 2139.

"[T]he EEOC uses a specialized definition of the term 'substantially limits' when referring to the major life activity of working: 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' "

*Id.* at 491, 119 S.Ct. 2139 (citing 29 C.F.R. § 1630.2(j)(3)(i)).

■ Here, Burrell does not allege that his impairment substantially limits his ability to work, nor does the record reflect such an inability. Burrell has consistently maintained employment and in fact insists he is able to return to his position at Cummins but for Cummins' unreasonable requirement. "[T]to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).

In *Murphy v. United Parcel Service,* the Supreme Court found that the plaintiff, who suffered from high blood pressure, was not substantially limited in a major life activity when he was medicated. *Id.* at 521, 119 S.Ct. 2133. The Court then turned to the question of whether the plaintiff was "regarded as" disabled by the defendant in the major life activity of working since the plaintiff was unable to obtain a commercial vehicle certification due to his high blood pressure. *Id.* The Court reasoned that the plaintiff's inability to meet the regulations was "not sufficient to create a genuine issue of material fact as to whether petitioner [was] regarded as unable to perform a class of jobs utilizing his skills." *Id.* at 524, 119 S.Ct. 2133. The Court found that the plaintiff was "generally employable" as a mechanic and only excluded from a specific class of jobs which required commercial vehicle certification. *Id.* The Court determined this was insufficient, as a matter of law, to prove that the defendant regarded him as substantially limited in the major life activity of working. *Id.* at 525, 119 S.Ct. 2133.

Consequently, in light of petitioner's skills and the array of jobs available to petitioner utilizing those skills, petitioner has failed to show that he is regarded as unable to perform a class of jobs. Rather, the undisputed record evidence demonstrates that petitioner is, at most, regarded as unable to perform only a particular job. This is insufficient, as a matter of law, to prove that petitioner is regarded as substantially limited in the major life activity of working.

*Id.*

*Murphy* is instructive to the case at bar. First, Burrell, as true for the plain-

---

**6.** The Court performs this analysis despite the fact that Burrell does not directly assert that Cummins regarded him as substantially limited in any *particular* major life activity. He argues (1) Cummins viewed his diabetes in a negative light by refusing to permit him to continue working despite his physician's reassurances; and (2) Cummins' "records make it clear that it regarded Burrell as unable to work in any type of industrial setting where machinery was a component of the job." For purposes of summary judgment, viewing the facts in the light most favorable to Burrell, the Court reasons it is Burrell's contention that Cummins regarded him as substantially limited in the major life activity of working.

tiff in *Murphy*, is not substantially limited in a major life activity when he is properly medicated. Second, Cummins found Burrell was incapable of performing the *specific* job of upfit technician because of noncompliance with his diabetes and the safety risk created by an LBS episode. However, Burrell remains qualified to perform a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. He is currently employed as a shipping, receiving and parts clerk and has held jobs as a stock clerk.

Nor was Cummins' employment determination based on "prejudice, stereotype or myth." Rather, it was based on an accumulation of episodes in which Burrell could not properly perform the functions of his job because of his own failure to monitor his blood sugars despite being given amply opportunities by Cummins. The record shows that the duties of an upfit technician at Cummins include (1) driving a forklift; (2) running diesel equipment; (3) driving company vehicles to customers' properties; (4) repairing diesel engines; (5) utilizing cranes, welders, and other power equipment; and (6) lifting heavy equipment. Without a doubt, it is essential to the performance of these duties that an employee stay oriented and functional. Burrell admitted at his deposition that the functions of his job, including working around engines and driving forklifts, present certain dangers. He also recognized that co-workers rely on each other in the appropriate performance of these duties, otherwise they place themselves and each other in jeopardy. Burrell admitted that if he had an LBS episode while working on an engine, he could be placing his co-workers and himself in jeopardy.

After repeated warnings and disciplines, several LBS episodes requiring paramedic response, intervention by co-workers, an injury accident, and an arrest, Cummins demanded assurance for the safety and well-being of its other employees and customers. Although Dr. Larson wrote letters to Cummins, she could not guarantee that Burrell would not have an LBS episode while driving or operating heavy equipment. At most, she believed that the risk of LBS episodes could be reduced if Burrell tested his blood sugars before he drove or operated equipment. However, this solution was previously available to Burrell, but he repeatedly failed to comply with it. In light of these facts, Cummins had reason to find these assurances were not sufficient. Far short of any medical guarantee, Cummins had a substantial record of safety problems associated with this employee.

Although Burrell's doctors never placed him on any restrictions due to his diabetes, they did recommend frequent blood sugars tests and eating as needed to avoid LBS episodes. It is undisputed that Cummins afforded Burrell ample time to test his blood sugars and eat or take insulin as needed. In fact, Burrell admits that he never asked for further accommodations. Burrell argues that Cummins discriminated against him because "[t]hey refused to let me return to work even after my doctor and the doctor's assistant had supplied them with a professional view of my situation of my health and being able to work and working with the company, jumping all the hurdles and stuff, and they still want a guarantee from may physician to allow me to return to work."

The ultimate responsibility to maintain his medical condition and properly perform the duties of his job rested with Burrell. The record shows Burrell failed to follow his doctors' orders, failed to disclose severe LBS episodes to his doctors, and consistently skipped meals, knowing it created a danger of an LBS episode. It was this failure to maintain his medical condi-

tion that caused Burrell's inability to safely perform the essential functions of his position, not Cummins' perception of his impairment. It was not until he after he was terminated that Burrell sought and consistently responded to medical maintenance of his impairment. Burrell was not "regarded as" disabled by Cummins, rather, he was regarded as noncompliant with his medical condition, and a resulting safety risk.

■ On the record before the Court, Burrell has not met the first element of a prima facie case under the ADA because he has not satisfied his burden of showing he is disabled within the meaning of the ADA. Furthermore, Burrell has not stated a claim under the ADA, since he does not allege Cummins failed to accommodate his alleged disability.[7] In fact, he admits he never asked for an accommodation and that Cummins always gave him the opportunity to test his blood sugars and treat them as necessary. " 'In general, it is the responsibility of the individual with the

disability to inform the employer that an accommodation is needed.' " *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1217 (8th Cir.1999) (quoting *Wallin v. Min. Dept. of Corrs.*, 153 F.3d 681, 689 (8th Cir.1998)). Rather, Burrell argues Cummins refused to *reconsider* his qualifications based on the letter from Dr. Larson and his current medical regimen. This does not state a cause of action under the ADA. "Like the diabetic police officers in *Burroughs v. City of Springfield*, 163 F.3d 505 (8th Cir.1998), and *Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir.1995), [Burrell] did not request a disability accommodation, [he] asked for a second chance to better control [his] treatable medical condition. That is not a cause of action under the ADA." *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir.1999).[8]

■ Nor was Cummins required under the ADA to reallocate essential functions of a job to accommodate Burrell. *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784,

---

7. For purposes of summary judgment, Cummins concedes Burrell performed the essential functions of his job with or without accommodation.

8. In *Burroughs v. City of Springfield*, 163 F.3d 505 (8th Cir.1998), a diabetic police recruit was forced to take a voluntary demotion or resign because he had two LBS episodes due to poorly timed eating while on duty. The city determined he was unable to perform the functions of the job, specifically carry a gun, because of the danger it posed if he were to have an LBS episode. *Id.* The court reasoned that he was not terminated because of his disability but because of his failure to control a treatable medical condition. *Id.* at 506.

Similarly, in *Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir.1995), a probationary officer, known to be diabetic when he was hired, had just one LBS episode while driving, and the city terminated him without giving him a second chance to better maintain his medical condition. The court found that although he was capable of performing

the job without accommodation, he was terminated *"because of* his 'failure to alertly and accurately keep [himself] functional and monitor [his] disease.' " *Id.* at 666. The court found its decision was bolstered by the officer's admission that he was not asking for an accommodation; instead, he was asking the city for "a second chance." *Id.* However, the court reasoned "the ADA does not require this." *Id.* at 667.

Therefore, had Burrell proven a prima facie case under the ADA, the analyses of *Burroughs* and *Siefken* would apply. Here, as in those cases, Burrell has not asked for any accommodation beyond what Cummins was already providing before he was terminated—the ability to test his blood sugars and eat if necessary. However, over his fourteen year employment with Cummins, Burrell consistently failed to control a treatable medical condition. Burrell, as did Burroughs and Siefken, asks Cummins to reconsider and give him another chance to control his disease. As stated, this is not a cause of action under the ADA. *Id.*

788 (8th Cir.1998). Although Cummins temporarily had other employees drive and operate certain equipment during Burrell's suspensions, the ADA does not require Cummins to permanently reallocate those duties. *Id.*

## V. CONCLUSION

During the performance of his duties at Cummins, Burrell chronically failed to monitor his blood sugars and eat properly, which resulted in several LBS episodes. This noncompliance created a risk to himself and to others because of the nature of the work involved. It is undisputed that Cummins allowed Burrell to check his blood sugars as often as necessary, and to eat if necessary to maintain the proper levels. Burrell's diabetes is not a disability within the meaning of the ADA, nor did Cummins regard Burrell as disabled within the meaning of the ADA; rather, Cummins regarded Burrell as failing to control a treatable medical condition.

Burrell has not met his burden of showing that he suffers from an actual or perceived disability within the meaning of the ADA. Therefore, he has not satisfied the first element of a prima facie case of disability discrimination, and summary judgment is appropriate. *Kellogg,* 233 F.3d at 1086. For the foregoing reasons, Defendant's motion for summary judgment (Clerk's No. 10) must be granted. As previously discussed, the Defendant's Motion to Strike (Clerk's No. 25) is granted.

**IT IS SO ORDERED.**